COMMISSIONER OF INTERNAL REV-
ENUE, Petitioner,

v.

MERCANTILE NATIONAL BANK AT
DALLAS, Respondent.

No. 17622.

United States Court of Appeals
Fifth Circuit.

March 15, 1960.

Myron C. Baum, Lee A. Jackson, Harry Baum, Dept. of Justice, Washington, D. C., Claude R. Marshall, Sp. Atty., I. R. S., Arch M. Cantrall, Chief Counsel, I. R. S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., for petitioner.

Jack G. Johnson, Hubert D. Johnson, Dallas, Tex., for respondent.

Before CAMERON, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

The respondent is a National Banking Association at Dallas, Texas. Before us for review is a determination of the Tax Court as to the excess profits taxes payable by the Bank for the years 1951, 1952 and 1953. Mercantile National Bank at Dallas v. Commissioner, 30 T.C. 84. The facts are not in dispute nor are the factual inferences to be drawn from them. Since 1944 the Bank, with the Commissioner's approval, has used the reserve method of accounting for bad debts. Under this method the Bank set up, initially, a bad debt reserve and added to it, annually, further amounts. The amounts credited to the bad debt reserve account each year were deducted in computing the Bank's normal tax and surtax. Debts determined to be worthless were charged to the bad debt reserve and bad debt recoveries were credited to the reserve, but these charges and credits were not used in computing normal tax and surtax although they might indirectly affect it because of the limitation placed upon the accumulated total of the reserve. See Mim. 6209, 1947–2 C.B. 26. Under the Excess Profits Tax Act of 1950,[1] banks using the bad debt reserve method were not permitted to deduct the amount allowable under such method for bad debts, but in lieu thereof were allowed to take a deduction for the bad debts which became worthless during the taxable year.[2] The statutory provision was supplemented by a regulation of the Commissioner [3] which spelled out the method of effecting the adjustment between the normal-tax net income and excess profits net income of banks using the bad debt reserve method.

In its excess profits tax returns for the years involved the Bank computed its excess profits net income by adding to the normal tax net income the amounts allowable for the bad debt reserve increases for the respective years, and taking de-

---

1. 64 Stat. 1137 et seq.

2. "The excess profits net income for any taxable year ending after June 30, 1950, shall be the normal tax net income, as defined in section 13(a) (2), for such year increased or decreased by the following adjustments:
   "(1) Adjustments.
   \* \* \* \* \*
   "(G) Recoveries of bad debts. There shall be excluded income attributable to the recovery of a bad debt if the deduction of such debt was allowable from gross income for any taxable year beginning before January 1, 1940, or beginning after December 31, 1945, and ending before July 1, 1950, or if such debt was properly charged to a reserve for bad debts during any such taxable year;
   \* \* \* \* \*
   "(L) Bad debts in case of banks. In the case of a bank (as defined in section 104) using the reserve method of accounting for bad debts, there shall be allowed, in lieu of the amount allowable under the reserve method for bad debts, a deduction for debts which became worthless within the taxable year, in whole or in part, within the meaning of section 23(k); \* \* \*". 26 U.S.C.A. Excess Profits Taxes (I.R.C.1939, as amended) § 433(a).

3. "The excess profits net income computed under section 433(a) for any taxable year ending after June 30, 1950, is the normal-tax net income increased or decreased by the adjustments provided in section 433(a) (1). \* \* \*
   \* \* \* \* \*
   "(1) In the case of a bank (as defined in section 104) using the reserve method of accounting for bad debts, section 433(a) (1) (L) requires an adjustment to normal-tax net income equal to the difference between (1) the amount of the deduction for additions to the reserve for bad debts allowed under section 23(k) (including, in the case of the taxable year in which the reserve is established, the deduction for the initial credit to the reserve) and (2) the amount that would have been allowable as a deduction under section 23(k) for bad debts for the taxable year if the bank did not use the reserve method of accounting for bad debts. The adjustment is effected by increasing normal-tax net income by the amount of the deduction allowed under section 23(k) for the additions to the bad debt reserve for the taxable year, and by decreasing normal-tax net income by the amount of the deduction which would be allowable under section 23(k) for the debts which actually became worthless in the taxable year, in whole or in part." Treas.Reg. 130 § 40,-433(a) (1), (a) (2).

ductions for the amounts of the debts determined to be worthless during the several years. During these years the Bank had substantial recoveries of debts which had been charged in prior years to the bad debt reserve. The amounts of these recoveries were not included as income in the excess profits tax computations of the Bank. The Commissioner concluded that the excess profits net income should be increased by the amounts of the bad debt recoveries and deficiency assessments were made which were redetermined by the Tax Court and are before us for review.[4] The Tax Court, in sustaining the Bank's position, thus stated its reasons:

"We agree with the petitioner [Bank] that the respondent [Commissioner] erred in making this adjustment. In enacting section 433 (a), Congress has specifically, and in detail, provided for the method of computing excess profits net income. In subparagraph (L) it has specifically legislated with regard to the treatment of bad debts in the case of banks employing the reserve method. Neither in that subparagraph nor elsewhere in section 433 (a) did Congress provide for the inclusion by such banks of recoveries of bad debts. We must assume that Congress, in specifically legislating with regard to banks employing the reserve method, completely expressed its intention as to the effect of bad debts and recoveries in the computation of their excess profits net income. Considering the precise detail provided by Congress for the computation of excess profits net income, we think that had it intended to implement subparagraph (L) by restoring to excess profits net income of a bank on the reserve method any income from recoveries of bad debts, it would have so provided. The Congressional committee reports regarding section 433 seem to indicate that subparagraph (L) spells out the ex-

tent of bad debt adjustments to be made in the case of banks on the reserve method in reaching the equitable result referred to in the Senate report; at least such reports do not indicate that any further adjustment is to be made. Nor do the regulations promulgated under section 433 (a) of the Code provide for any further adjustment." 30 T.C. 93–94.

The Commissioner attacks the Tax Court's decision as "a mere exercise in literalism and a perversion of the legislative intent." He urges that the decision is "contrary to the plain meaning and intent of the applicable statutory provisions and produces an injustice which was never intended by the Congress."

Taxpayers, including banks, not using the bad debt reserve method of accounting were entitled, for normal income tax purposes under the 1939 Internal Revenue Code, as amended, to take deductions for debts which became worthless during the tax year, and are required, subject to the "recovery exclusion" provisions, to include as taxable income the bad debt recoveries during the year of their receipt to the extent that a tax benefit was received during a prior year. 26 U.S.C.A. (I.R.C.1939, as amended) §§ 22(b) (12), 23(k) (1); Merchants National Bank of Mobile v. Commissioner, 5 Cir., 1952, 199 F.2d 657. Banks using the bad debt reserve method, in computing their normal tax income, were entitled to deduct the amount which, during the taxable year, was added to the bad debt reserve. Although the amount of the accumulated bad debt reserve is decreased by actual bad debt losses sustained and increased by bad debt recoveries, the losses and recoveries as such do not enter into the computation of normal tax income. For normal tax computation only the amount of the addition to the bad debt reserve is deductible even though that amount should be greatly exceeded by actual bad debt losses. So also, for normal tax purposes, bad debt

---

4. No review is sought by the Bank with respect to other questions which were decided against it by the Tax Court.

recoveries are not included as taxable income even though such recoveries should greatly exceed the addition to bad debt reserves.

■ The excess profits tax net income for the years here involved was the normal tax net income increased or decreased by the adjustments set forth in the statute. The adjustment, in the case of banks using the reserve method of accounting for bad debts, allows a deduction for debts becoming worthless instead of the amount of the addition to the bad debt reserve. The bad debt recoveries of such banks are not, therefore, to be included in their excess profits taxable income unless it appears that the Congress so intended as a corollary to the expressed provision requiring that the bad debt deduction should be the actual bad debt losses rather than the amount added to the bank's bad debt reserve. Such intent is not expressed in the language of Section 433(a) (1) (L), nor is such intent to be implied from the language of the statutory provision. In the courts of England it is the rule that, "If Parliament does not mean what it says it must say so." Herbert, Uncommon Law, 192. But such rule is not to control in construing acts of Congress. Association of Westinghouse Salaried Employees v. Westinghouse Electric Corporation, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510. Cf. Dissenting opinion Commissioner of Internal Revenue v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127. Aids to construction may be resorted to, it has been said, even where there is no ambiguity. United States v. Korpan, 7 Cir., 1956, 237 F.2d 676, reversed on other grounds 354 U.S. 271, 77 S.Ct. 1099, 1 L.Ed.2d 1337.

■ The reasons found in the legislative history for the enactment of the provision are substantially the same in the committee reports of the House of Representatives [5] and of the Senate.[6] In neither committee report is there a suggestion that banks using the reserve method of bad debt accounting should include bad debt recoveries as income. The discussion in the reports deals wholly with bad debt losses and not at all with bad debt recoveries. The Commissioner recognizes this, and so points to the congressional use of the word "equitable". Since taxpayers other than banks using the reserve method are required to include bad debt recoveries as well as deducting bad debt losses, the Government insists it would be inequitable to allow such banks to omit the recoveries from their excess profit tax income. We are

5. "For income tax purposes, banks have been permitted to use the reserve method of accounting for bad debts. The banks which elected to use this method, beginning in 1947, have for the most part accumulated reserves which equal or approach the maximum allowable under the existing rulings. The fact that the reserves have reached or approached the allowable maximum, plus the probability that losses from bad debts will be abnormally low during the excess profits tax years, means that the deduction in the excess profits tax period will be comparatively low. To permit an equitable comparison between the base-period net income and the income of the excess profits tax years, the bill permits banks using the reserve method of accounting for bad debts to claim a deduction for the purpose of determining excess profits tax net income on the basis of debts which become worthless in whole or in part during the taxable year." H.R.Rep. No. 3142, 81st Cong., 2d Sess., p. 14, 1951–1 C.B. 187, 196.

6. "Banks which have elected to use the reserve method of accounting for bad debts for income tax purposes substitute for excess profits tax purposes a deduction for debts which became worthless in whole or in part within the taxable year. This is desirable because the banks which elected to use the reserve method for income tax purposes beginning in 1947 have for the most part accumulated reserves that equal or approach the maximum allowable under the existing rulings. In view of this situation and because of the probability that losses from bad debts will be comparatively low during the excess profits tax years it is likely that the deductions under the reserve method will be abnormally low during the excess profits tax period. The deduction of such losses as they occur will provide a more equitable result." S.Rep. No. 2679, 81st Cong., 2d Sess., p. 15, 1951–1 C.B. 240, 250.

reminded by the Government that "A desire for equality among taxpayers is to be attributed to Congress, rather than the reverse." Colgate-Palmolive-Peet Co. v. United States, 320 U.S. 422, 64 S.Ct. 227, 230, 88 L.Ed. 143, rehearing denied 320 U.S. 816, 64 S.Ct. 433, 88 L.Ed. 493. However, the attributing to Congress a desire for equality will not supply a congressional intent that cannot be made to appear from either the legislation or the legislative history of a controlling statute.

█ "Equitable" does not necessarily mean exact equality. It means fair, just, and impartial. Pearce v. Wisdom, 175 Ga. 663, 165 S.E. 574; Hackett v. Equitable Life Assurance Society, 50 App.Div. 266, 63 N.Y.S. 1092; Taylor v. School District, 128 Neb. 437, 259 N.W. 168; Burlington Transportation Co. v. Iowa State Commerce Commission, 230 Iowa 570, 298 N.W. 631; United States v. 11,360 Acres of Land, D.C.N.D.Cal. 1945, 62 F.Supp. 968. The committee report shows the desire to create an equitable result, that is, one which would be fair, just and reasonable for banks using the reserve method and not necessarily for other taxpayers. Inequalities in Federal taxation are not unknown. The Revenue Act of 1948 providing for joint returns by husbands and wives made for equality of the tax burden upon married couples throughout the country but discriminated against bachelors and spinsters. So also insurance companies are taxed under separate provisions of the Internal Revenue Code and some kinds of insurance companies are taxed differently than others. Whether it is fair, just, reasonable, and equitable that banks using the bad debt reserve method of accounting should, for excess profit tax computation, deduct actual bad debt losses rather than the reserve allowance without including bad debt recoveries is to be determined by the Congress; not by the Commissioner or the Courts. We think the determination has been made by Congress and we affirm the decision of the Tax Court so holding.

█ There is nothing in the statute or in the committee reports which expressly or by necessary implication authorizes a determination such as the Commissioner urges upon us. There is no ambiguity in the applicable statute. If it tends to give a benefit to a particular class of taxpayers, we cannot say that Congress did not so intend. As said by the Supreme Court, "After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor subtract, neither to delete nor to distort." 62 Cases, etc. of Jam v. United States, 340 U.S. 593, 71 S.Ct. 515, 518, 95 L.Ed. 566. Whether Section 433(a) (1) (L) would be beneficial or not to a particular bank would depend upon its own bad debt experience during the taxable year.

█ The Government urges that the Tax Court's decision construes Section 433(a) (1) (L) as conflicting with and annulling the effect of Section 433(a) (1) (G). We cannot agree. This latter section, considered in context, relates to taxpayers who do not use the bad debt reserve method of accounting and so are required to include bad debt recoveries in the computation of normal tax income. The section permits such taxpayers to exclude certain bad debt recoveries from excess profits income. It is not a provision which requires the inclusion of bad debt recoveries by any taxpayer.

It is by no means certain that the question we decide was considered by the framers of the statute. It may be that the statute gives an undeserved benefit to a particular class of taxpayers. Commenting upon such problems, the Supreme Court has said:

"Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the

legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. Monson v. Chester, 22 Pick. [Mass.] 385, 387. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the lawmaker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts." Crooks v. Harrelson, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156; See St. Louis Co. v. United States, 3 Cir., 1956, 237 F.2d 151.

We can no more grant relief to the Government from hardships than we could to a taxpayer. The decision of the Tax Court is

Affirmed.