Louise K. Herter v. Commissioner.
Herter v. Commissioner
Docket No. 69712.
United States Tax Court
T.C. Memo 1961-19; 1961 Tax Ct. Memo LEXIS 329; 20 T.C.M. (CCH) 78; T.C.M. (RIA) 61019; January 27, 1961
*329 1. Cost of installing a new permanent alternating current electrical system in a building originally wired for direct current to which had been added some temporary wiring for alternating current is a capital expenditure. 2. Amounts paid as commissions for procuring leases extending over a period of more than 1 year held to be capital expenditures, amortizable over the terms of the leases to which applicable. 3. Amount paid as premium for fire insurance policy for 3-year term held to be amortizable over the term of the policy. 4. Amounts allowable as deductions for charitable contributions, taxes, and miscellaneous expenses for the production of income determined from the evidence. 5. Amounts claimed as deductions for travel expenses disallowed for failure of proof that such amounts constituted ordinary and necessary business expenses or ordinary and necessary expenses in the management, conservation, or maintenance of income-producing property. Neilson Olcott, Esq., for the petitioner. Charles M. Greenspan, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: The respondent determined deficiencies in petitioner's income tax in the amounts of $7,469.94 for the taxable year 1950, $2,660.48 for the taxable year 1951, and $7,095.95 for the taxable year 1952. Respondent also determined additions to the tax for the year 1950 in the amount of $765.61 under section 294(d)(1)(A) of the Internal Revenue *331 Code of 1939 and $510.40 under section 294(d)(2). Certain issues were conceded at the trial or on brief by each of the parties and petitioner has failed to prosecute certain other issues raised in the petition in that she presented no evidence or argument with respect thereto. The issues remaining for decision are: (1) Whether petitioner's pro rata portion of amounts paid in each of the taxable years to install an alternating current electrical system in a building in which she had a 29 per cent undivided interest represent capital expenditures, recoverable through depreciation allowances, or ordinary deductions in the year of payment; (2) Whether petitioner's pro rata portion of amounts paid in the taxable years 1950 and 1952, respectively, for rental commissions to secure long-term leases with respect to the building, should be spread ratably over the terms of the respective leases to which they apply, or, since petitioner reports her income on the cash basis, should be deducted in the year paid; (3) Whether petitioner is entitled to a deduction for her pro rata portion of the total fire insurance premium paid with respect to the building during the taxable year 1950, a part *332 of such premium being for insurance coverage in years subsequent to those in which the premium was paid; (4) Whether the Commissioner erred in disallowing in full the deductions claimed by petitioner in each of the taxable years for charitable contributions, taxes paid, and payments for miscellaneous expenses consisting primarily of postage, stationery, cables and telephone calls; (5) Whether petitioner is entitled to deductions for travel expenses in each of the taxable years, and, if so, the amounts of such deductions. Findings of Fact The petitioner is an individual. She filed a Federal income tax return for the taxable year 1950 with the district director of internal revenue for the second district of New York, reporting a net income of $5,818.53. She filed a Federal income tax return for the taxable year 1951 with the district director of internal revenue for the third district of New York, reporting a net income of $32,463.11. She filed a Federal income tax return for the taxable year 1952 with the district director of internal revenue for the second district of New York, showing a net income of $20,878.15. The only source of income shown on any of these returns was "Taxpayer's *333 29% share" of the income of a building located at 902 Broadway, New York City. Petitioner's income was reported on the cash receipts and disbursements basis of accounting for each of these years. The property located at 902 Broadway consisted of a loft building of 20 stories, which was built about the year 1912. In 1945 the building was in good condition. The building was constructed to be used for light manufacturing and most of the tenants to whom space was rented immediately upon the completion of the building were engaged in such business. From 1933 to 1949, the building was used primarily for office or clearical work. During the years 1933 to 1942 the Welfare Department of the City of New York occupied 17 floors, releasing a floor in each of the years 1942, 1943, and 1945. In 1949 the buying office of H. L. Green Company occupied 4 floors. As of January 1, 1950, the Welfare Department of the City of New York occupied 11 floors and one-half of the storm basement, and by May 31, 1950, the City of New York had completely vacated the building. When the City of New York originally took a lease on the building in 1933 it was a desirable tenant even though it paid a lower rental than *334 prior tenants since at that time it was difficult to obtain tenants for loft-type buildings in New York City. By the late 1940's there was a demand for space of the type available in the building at 902 Broadway by private businesses at rentals in excess of the rental being paid by the City of New York. For this reason the managers of the building were desirous that the City vacate the building. Clarence Herter, petitioner's late husband, died in 1945. Prior to his death he had owned a 29 per cent interest in the real property located at 902 Broadway. Petitioner was the sole heir of Clarence Herter. The estates of Morris Herter and Gustave Herter, during the taxable years here involved, owned the other 71 per cent interest in this property. In 1912 when the building at 902 Broadway was erected, a direct current electrical system was installed. At that time the direct current electrical system was sufficient to take care of all the manufacturing that could be done in the building. During the time that the City of New York was occupying the building, the City furnished labor for installing a temporary alternating current electrical system for light on many floors and for small office *335 machinery which required alternating current. In 1950 this temporary system was deemed to be inadequate by the managers of the building because a certificate from the New York Board of Fire Underwriters could not be obtained for its use and because the wiring put in by the City of New York was not adequate for use by some of the new tenants. Between the time the building had been constructed in 1912 and the year 1950 the use of direct electrical current had gradually diminished until in 1950 machinery using direct current was becoming obsolete. It was decided to install a new alternating current electrical system in an orderly manner in the building. A new vault was put in and the alternating current was brought in on a different side of the building. The work that was required for the system for the 11 floors that had been vacated by the City was planned at one time. Eleven 3 1/2-inch-conduit pipes ("risers") were installed for the new alternating current lines, in a separate area from the old lines. The alternating current service in the building was increased from between 600 and 1,000 amperes to 4,000 amperes of alternating current. A new 4,000-ampere alternating switch was installed. *336 The new alternating current electrical system installed in the building had a useful life of more than 1 year. When the City of New York occupied the building, it had a special arrangement with the Consolidated Edison Company of New York. Under this arrangement the owners of the building had no control over the City's use of electricity and the metering and charging therefor. The City of New York put in wiring where required. When the City moved out, the majority of the new tenants who came in were engaged in light manufacturing. The new tenants required alternating current for lighting, for their manufacturing machines and for other purposes. When the City of New York moved out, the owners of the building needed separate meters for each new tenant. The owners of the building paid the total amounts of $27,791, $1,875, and $10,419.16 in the taxable years 1950, 1951, and 1952, respectively, for the installation of the new alternating current electrical system. Petitioner, in each of these years, in effect, claimed her aliquot share of such amounts as deductions by reporting as income from her interest in the building, 29 per cent of the income remaining after deducting the claimed *337 costs of operation of the building among which were included the amounts paid in each year for the installation of the new alternating current electrical system. Respondent disallowed these claimed deductions. The value of the real property at 902 Broadway, New York, New York, was found to be $775,000 as of March 14, 1945, for purposes of valuing the Estate of Clarence S. Herter in Estate of Clarence S. Herter, a Memorandum Opinion of this Court filed March 31, 1954. The property was sold at public auction in 1959 for about $2,100,000. The owners of the building paid the total amounts of $19,623.02 and $4,448.75 in the taxable years 1950 and 1952, respectively, for rental commissions to secure leases which extended over a period of more than 1 year. These amounts were deducted in full in each year from the income from rentals of the building before determining the income therefrom to be distributed to the owners. Petitioner reported as income her distributable portion of the rentals diminished by this disbursement. Respondent disallowed in part petitioner's deduction so claimed for her pro rata portion of these amounts and spread these payments ratably over the terms of the respective *338 leases to which they applied. Respondent allowed petitioner a deduction for 29 per cent of $2,810.59 and $871.97 as amortization in the taxable years 1950 and 1952, respectively. The respondent disallowed in part petitioner's deduction claimed in the same manner as the deduction for rental commissions for her pro rata portion of $1,824.01 paid as a fire insurance premium in 1950. Respondent spread this amount so disallowed ratably over the term of the policy, i.e., from February 2, 1950 to February 1, 1953. Spear and Company, Inc., were the agents for the building located at 902 Broadway from 1933 until the building was sold in 1959. It was the consistent practice of Spear and Company, Inc., during this entire period to render monthly statements to the owners of the building. These monthly statements would show the total rents collected and the total disbursements made in each month. The excess of the rents received over the monthly disbursements was distributed monthly to the owners in accordance with their proportionate interests. When a commission for obtaining a longterm lease, an insurance premium or other expense was incurred, it was paid by Spear and Company in full from *339 the rents of the month in which incurred and so shown in the statements sent to the owners. Spear and Company did not keep the books or accounting records of the owners of the building. Petitioner, in her income tax returns filed for each of the years 1946, 1948, and 1949, claimed a deduction of her pro rata share of the entire rental commissions paid in such year, including those paid for leases extending over a period of more than 1 year. In examining petitioner's tax return for each of these years, respondent's agent disallowed in part the claimed deduction and amortized over the period of the various leases those commissions applicable to leases for a period of more than 1 year. In the final disposition of her income tax liability for each of these years, petitioner agreed to this adjustment. In the year 1947 no rental commissions were paid for leases for a period of more than 1 year for the building at 902 Broadway. In the year 1947 petitioner claimed a deduction for an insurance premium paid on the building at 902 Broadway which was for a 3-year term. Respondent's agent in his audit disallowed the deduction in part and pro rated the premium paid over the 3-year period, 1947 through *340 1949, and petitioner agreed to this adjustment. Petitioner showed in her return as charitable contributions to various churches in the United States and France for each of the taxable years here involved the amount of $1,500. In 1951 and 1952 she claimed this total amount as a deduction and in 1950 claimed $1,319.21 as a deduction because of the percentage limitation on charitable contributions. Petitioner was a very religious person and attended church not only on Sunday, but many times on other days when she was passing a church or felt an inclination to attend church. She did not have a particular church which she attended regularly but attended the Catholic church in the vicinity of her residence or where she happened to be when she felt the desire to attend church. Petitioner contributed not more than $5 at each regular church service she attended. However, when she attended the church when no formal service was in progress, it was very often for the specific purpose of making a special contribution for some favor she felt she had received. At these times she would drop varying amounts of cash up to $100 into the church box. Some of the special contributions were made to churches *341 in France and some to churches in the United States. Petitioner claimed deductions in the amounts of $1,556.97, $1,768.55, and $2,517.59 for the years 1950, 1951, and 1952, respectively, for taxes paid, consisting of the following: Income
Sales
Taxes
and
Foreign Oc-
State of
Sundry
cupancy and
Year
New York
Taxes
Meals Taxes
1950
$ 476.54
$50.00
$1,030.43
1951
165.25
50.00
1,553.30
1952
1,767.59
( $750 for both) Petitioner paid to the State of New York as income taxes in each of the years set forth above the full amount claimed by her as a deduction. The sales and sundry taxes constituted petitioner's estimate of such taxes paid by her based on expenditures made while in New York. Petitioner was in the City of New York for a substantial length of time in each of the years here involved and lived at such hotels as the Ritz Carlton, the Ritz Tower, and the Drake. Fifty dollars is a reasonable estimate for sales taxes paid by petitioner in each of the years 1950, 1951, and 1952. The payments claimed by petitioner as foreign occupancy and meals taxes were based on her estimates of amounts added to her bills while she was living in *342 France. She did not know the nature of the tax or by what authority or upon whom it was imposed. In 1952 petitioner claimed in her tax return a deduction of $300 under the designation, "Notary fees and other expenses in the production of income," which claimed deduction respondent disallowed. Petitioner, on her income tax returns for 1950 and 1951, claimed as miscellaneous deductions the amounts of $100 and $125, respectively, with the explanatory word, "accounting." Respondent disallowed the claimed deductions since he allowed petitioner the standard deduction for each of the years. Petitioner explained the claimed miscellaneous deductions at the trial as her estimate of the minimum amount spent for cables, telegrams, telephone calls, postage, and stationery in connection with business matters. Petitioner took an active part in the management of the property located at 902 Broadway from which she derived her income. The property was managed by Spear & Company, but petitioner, prior to and during the taxable years here involved, kept in close touch with the managers and advised them on many occasions in connection with repairs and renovations of the property and tenants to whom rentals *343 should be made. She also wired or telephoned on many occasions to the office of the Alien Property Custodian in Washington in an effort to get leases signed and rental payments released. She also cabled or wrote the accountant who handled her personal accounting and tax matters on numerous occasions during the years here involved. At times during these years petitioner would pay as much as $22 for a single cable. For the years 1950 and 1951 the only deductions claimed by petitioner which respondent's agent was able to verify to his satisfaction as allowable deductions were the payment of income taxes to the State of New York as set forth above and the deductions claimed in 1950 and 1951 as "accounting" in the respective amounts of $100 and $125. In her 1952 tax return petitioner deducted the amount of $3,000 for traveling expenses from her pro rata portion of the income from the building at 902 Broadway in arriving at her income from rents reported in Schedule F. In her petition, petitioner claimed additional travel and other expenses in connection with the operation and management of the property at 902 Broadway in the amount of $11,500 for the year 1952, and for the years 1950 *344 and 1951 she claimed similar deductions in the amount of $14,500 for each year. For some years prior to the outbreak of World War II in Europe, petitioner and her husband, Clarence S. Herter, maintained a residence in Paris, France. At about the time, or shortly before the outbreak of the Second World War in Europe, petitioner and her husband gave up their residence in Paris and began to reside in New York City. Petitioner and her husband continued to reside in New York City until the death of petitioner's husband on March 14, 1945. Petitioner thereafter continued to reside in New York City until sometime in 1947 when she returned to Paris. Since 1947 throughout the years here involved, petitioner maintained her residence in Paris, France, but she had no business interests there. Petitioner was named executrix by her husband's will and was the sole beneficiary of his estate. The major asset of petitioner's husband's estate consisted of a 29 per cent undivided interest in the property at 902 Broadway, New York City. Gustave Herter, the brother of petitioner's husband, was a German alien. Gustave Herter, prior to his death, and later his estate, owned an undivided 35 per cent interest *345 in the building located at 902 Broadway. The Alien Property Custodian at some time undisclosed in the record had seized or threatened to seize the interest of Gustave Herter in this building. From the time petitioner resumed her residence in Paris throughout the years here involved, she made a number of trips from Paris to New York in connection with the administration of her husband's estate, dealing with the Alien Property Custodian and negotiating with respect to the sale of the property at 902 Broadway. Some of these trips were for the purpose of contesting the estate tax liability proposed against her husband's estate in a deficiency notice issued by respondent in August 1949. A petition contesting the proposed liability was filed with this Court and the case was tried in 1952. The precise years or times when these trips in connection with the estate tax liability of petitioner's husband's estate were made is not shown in the record except that she arrived in New York on January 28, 1952, for the purpose of preparing to testify and testifying at the estate tax trial before this Court and remained in New York until April 1952, when she returned to Paris. While she was in New *346 York during the latter part of 1951 and in 1952 she conferred with the representatives of the Gustave Herter and Morris Herter estates with respect to the ownership and title to the building and the possible sale of the property. The notice of deficiency in the estate tax case had determined that petitioner's husband's interest in the building at the date of his death was 64.2 per cent. Petitioner also appeared before the New York Surrogate Court on the question of title to the building at 902 Broadway on several occasions during the years here involved. Under date of August 26, 1952, petitioner, both in her individual capacity and as executrix of her husband's estate, executed, together with the other parties in interest, a confirmatory deed fixing the interests in the property at 902 Broadway of the various parties. This deed was also executed on behalf of the Attorney General of the United States by the Director of the Office of Alien Property. During the years 1951 and 1952 the heirs of Gustave and Morris Herter wanted to place a mortgage on the building or to sell it. Petitioner was unwilling to either mortgage or sell the building. During 1951 and 1952 while petitioner was *347 in New York she had discussions with her relatives and the Kaufman Syndicate with respect to placing a mortgage on the building or selling it. Three of petitioner's relatives, having interests totaling 53 per cent, at some undisclosed time sold their interests in the building to the Kaufman Syndicate. The Kaufman Syndicate attempted to buy petitioner's interest. Petitioner had discussions with representatives of the Kaufman Syndicate in this connection during the time she was in New York in 1951 and 1952. After the Kaufman Syndicate obtained a 53 per cent interest in the building, petitioner was not consulted on decisions made with respect to the operation of the building and had numerous discussions in this connection while in New York. The precise time of such discussions is not shown. In an Answer to the Complaint in United States of America v. Louise K. Herter, as Executrix of the Estate of Clarence S. Herter, Civil Action No. 110-76, United States District Court, Southern District of New York, sworn to by petitioner on July 30, 1956, the following allegations were made: 21. That in the performance of her necessary duties as Executrix as hereinabove set forth she returned to *348 this country between the Spring of 1947 and July 1956 on at least twenty different occasions and remained in this country solely for the purpose of carrying on her duties as Executrix for a period aggregating more than 150 weeks. 22. That the expenses of her trips to and from her residence in France and her expenses of living in New York while necessarily here as aforesaid amounted to at least $125,000.00. That no part of these expenses was paid to her by the Estate and that the Estate owes her this amount, no part of which has been paid. In disposing of this affirmative allegation the District Court in United States v. Herter, 148 F. Supp. 349 (1957) did not pass upon the merits thereof but held that the issue could have been raised in the case before the Tax Court involving the estate of Clarence S. Herter, and the decision of the Tax Court in that case having become final was an absolute bar to the raising of the issue in a subsequent proceeding. Petitioner arrived in New York on April 13, 1950, and returned to Paris on July 16, 1950. She returned to New York on September 4, 1950, and went back to Paris in November of that year. She returned to New York in January *349 1951 and returned to Paris in February 1951. She came back to New York on September 19, 1951, and returned to Paris on November 1951. She came to New York on January 28, 1952, and returned to Paris on April 1, 1952. She returned to New York in June 1952 and went back to Paris in October of that year. Petitioner always traveled on ships of the Cunard Steamship Company and the round trip fare for each of her trips was not less than $455. She spent at least $75 on tips and other incidental expenses on each of these round trips. When petitioner was in New York she generally stopped at the Ritz Tower, the Ritz Carlton, or the Drake, but if she was unable to find accommodations at one of these hotels she would stop at another hotel. When she obtained an apartment on a monthly basis she paid at least $650 per month for her accommodations and not less than at this same rate when she took accommodations on a weekly or daily basis. Petitioner took her meals in restaurants when she was in New York. She kept no records of the cost of her meals nor did she specify the restaurants in which she ate except to state that they generally were not in the hotels in which she stopped. She estimated that *350 her food cost $15 per day but did not specify what this amount covered. Petitioner spent a minimum of $7.50 per day for meals while in New York City. Petitioner spent at least $3,250, $1,625, and $3,900 for lodging and $1,125, $675, and $1,350 for meals in New York City in the years 1950, 1951. and 1952, respectively. The installation of the alternating current electrical system in the building at 902 Broadway was a capital improvement. Petitioner has failed to show that she had maintained consistently over a period of years an accounting system deducting in full commissions paid for leases extending over a period of more than 1 year and prepaid insurance in the year of payment. Petitioner contributed at least $700, $500, and $750 to Catholic churches in the United States in the years 1950, 1951, and 1952, respectively. Petitioner paid income taxes to the State of New York of $476.54, $165.25, and $1,767.59 in each of the years 1950, 1951, and 1952, and sales taxes of at least $50 in each of these years. Petitioner expended the amounts of $100, $125, and $125 in each of the years 1950, 1951, and 1952 for miscellaneous expenses in the production or collection of income. Petitioner *351 has failed to substantiate that any of the amounts she spent on travel including meals and lodging in New York were ordinary and necessary business expenses or ordinary and necessary expenses in the management, conservation, or maintenance of incomeproducing property. Opinion The first issue for decision is whether the cost of installing an alternating current electrical system in the building at 902 Broadway is a capital expenditure recoverable only through depreciation deductions or is deductible in the year of payment as an ordinary and necessary business expense for repairs. The legal principles applicable in distinguishing repairs from capital improvements have become well settled by the many cases involving this issue which have been before the courts. Nevertheless, the question is basically one of fact which must be determined from the particular circumstances in each case. Red Star Yeast & Products Co., 25 T.C. 321, 347 (1955). The expenditures here involved were for a new alternating current electrical system designed for a loft building of 20 floors which had *352 been built about 1912. When this building was originally constructed, the direct current electrical system placed therein was sufficient to supply electrical current to tenants engaged in light manufacturing on all floors of the building. However, sometime after the year 1912, electrical appliances and machinery using direct current gradually began to become obsolete. This building, in 1933, had been rented to the City of New York for use as offices for the Welfare Department. The City of New York had needed some alternating current for lighting and for its office equipment and had, with its own labor, installed in a haphazard manner a system of between 400 and 1,000 amperes. This system had been sufficient for the use of the City of New York which, through a special arrangement with the electric company, paid directly for its use of electricity, thus eliminating the necessity for the managers of the building providing separate meters for each floor. Sometime prior to the first tax year here involved and certainly by the beginning of the year 1949, the rental paid by the City of New York was less than the rental that could have been obtained from other types of tenants. For this reason *353 the managers of the building were desirous of having the City of New York vacate the premises. Nevertheless, they recognized the fact that they would be unable to use the alternating current electrical system placed in the building during the tenancy of the City of New York since it would not qualify for a New York Board of Fire Underwriters certificate. While there is no indication in the record that the direct current system originally installed in the building would not meet such fire regulations, this system had become obsolete. Since most machinery and office equipment was manufactured for use on alternating current, it was decided to install, and there was installed, in the building a new 4,000-ampere alternating current electrical system consisting of a new switch, a new wiring system completely separate from both the old haphazard alternating current system and the originally installed direct current system, a new vault, and new risers which permitted the installation of separate meters on the various floors. This new alternating current system had a useful life of more than 1 year and modernized the building in such a manner as to increase the value thereof within the meaning *354 of section 24(a)(2) of the 1939 Code. Petitioner's contention that the expenditure was for the purpose of keeping the property in an ordinary efficient operating condition is not supported by the facts. There was no restoration of an old facility but the construction and substitution of an entirely new one. Cf. Red Star Yeast & Products Co., supra, page 349, and Mercantile National Bank at Dallas, 30 T.C. 84 (1958), affd. 276 F. 2d 58 (C.A. 5, 1960). Not only did the installation of this new system increase the actual value of the building, it also made the building more valuable for use in the petitioner's business by permitting rentals to tenants engaged in light manufacturing and other private businesses from whom a higher rental could be obtained than could be obtained from the City of New York. Cf. Hotel Sulgrave, Inc., 21 T.C. 619 (1954). We agree with respondent that the amounts spent for the installation of the new electrical system are capital expenditures. The second issue for decision is whether commissions paid to brokers in 1950 and 1952 for securing leases which extended over a period of more than 1 year are *355 deductible in full by petitioner, a cash-basis taxpayer, in the year in which paid or should be amortized over the terms of the leases. It has long been settled that commissions paid by a lessor to secure a lease are capital expenditures to be spread ratably over the term of the lease whether the lessor reports his income on the accrual or cash basis. Meyran v. Commissioner, 63 F. 2d 986 (C.A. 3, 1933) affirming 24 B.T.A. 1346; Edward T. Blair, 31 B.T.A. 1192, 1205 (1935), revd. on another issue 83 F. 2d 655 (C.A. 7, 1936), revd. 300 U.S. 5 (1937) and cases therein cited. Cf. L. S. Munger, 14 T.C. 1236 (1950). Petitioner argues without citation of authority that an exception should be made in the instant case since both the managers of the building and the petitioner had consistently over a long period of time followed the accounting method of deducting commissions on long-term leases in the year in which paid and that such system clearly reflected petitioner's income. The method of accounting for receipts *356 and disbursements by the managers of the building was purely for the purpose of giving a report to the owners thereof and distributing the monthly rents collected in excess of monthly disbursements. It was not an accounting method or system for income tax purposes but was done only as an accounting to the owners of the building for the disposition of the rentals collected. The facts do not support petitioner's contention that she had consistently taken deductions for the commissions paid to secure leases for a term of over 1 year in the year in which paid. Since petitioner's husband died in 1945, it would appear that either 1945 or 1946 was the first year in which a return reporting the income of the building would have been filed by petitioner. There is no evidence in the record respecting petitioner's 1945 return, if any. In 1946, 1948, and 1949, petitioner had deducted commissions paid for leases extending over a period of more than 1 year, in her tax return as originally filed, in the year in which such commissions were paid. However, when this method of handling these deductions was changed by respondent's agent, petitioner agreed to the change. In 1947 no commissions were paid *357 for obtaining leases for a period of over 1 year for the building at 902 Broadway. These facts do not support petitioner's contention of a longtime consistent method of deducting commissions on leases extending over a period of more than 1 year in the year in which paid. The next question is whether respondent's disallowance of petitioner's pro rata share of the premium paid on a fire insurance policy for a 3-year term and proration of the premium over the life of the policy is correct. Here, again, petitioner contends that she had followed a long-established consistent practice of deducting insurance premiums in the year in which paid. She relies on the decision in Waldheim Realty & Invest. Co. v. Commissioner, 245 F. 2d 823 (C.A. 8, 1957), reversing 25 T.C. 1216 (1956). The holding in Waldheim Realty & Invest. Co., supra, is contrary to the holding in Commissioner v. Boylston Market Assn., 131 F. 2d 966 (C.A. 1, 1942), affirming 45 B.T.A. 1159 (1941), and in Martha R. Peters, 4 T.C. 1236 (1945) and George S. Jephson, 37 B.T.A. 1117 (1945). In the instant case it is unnecessary to *358 comment further upon this conflict of authority since the facts do not support petitioner's contention of a longtime consistent method of accounting. The fact that Spear and Company, Inc., in accounting to the owners of the building for the disbursement of the rents collected, deducted all disbursements from the rents received in each month does not establish a method or system of accounting for petitioner. So far as the record shows, the only prior year in which petitioner had deducted on her income tax return an insurance premium for a policy covering a period in excess of 1 year was in 1947. Upon auditing petitioner's return, respondent's agent dissolved this deduction in part and prorated the payment over the life of the policy, and petitioner agreed to this adjustment. We sustain the respondent on this issue. The next issue involves the correctness of respondent's disallowance of the deductions claimed by petitioner for charitable contributions, taxes, and miscellaneous expenses. Petitioner claimed deductions for charitable contributions in the amounts of $1,319.21, $1,500, and $1,500 for the taxable years 1950, 1951, and 1952, respectively. Petitioner contends that she made *359 contributions to various Catholic churches in the United States and in France in at least the amount of $1,500 in each of the years here involved. Petitioner testified in some detail as to her methods of making contributions to the various churches. After carefully considering this testimony, we believe that petitioner did contribute at least the amounts of $1,500 a year to various Catholic churches in the United States and in France. However, we do not agree that the amounts contributed to French churches are allowable deductions under section 23(o)(2) of the Internal Revenue Code of 1939.[1]To be entitled to a deduction for contributions made to Catholic churches in France, petitioner is required to show that these churches are organizations of the type listed in section 23(o)(2) of the 1939 Code. Muzaffer ErSelcuk., 30 T.C. 962 (1958). This she has not done. Cf. Dora F. Welti, 1 T.C. 905 (1943). Petitioner, in her testimony, made no attempt to estimate what portions of her contributions in each year were to churches in New York City. However, she did testify that *360 contributions were made in both New York and Paris, and considering the fact that petitioner spent a substantial amount of time in each of the years here involved in New York City, we feel that the evidence warrants the application of the principal announced in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). We, therefore, hold that petitioner is entitled to deductions for charitable contributions in the amounts of $700, $500, and $750 for the taxable years 1950, 1951, and 1952, respectively. *361 We have set forth in our findings the amounts claimed by petitioner as deductions for taxes paid. The sole reason for the disallowance by respondent of the deductions claimed for income taxes paid to the State of New York by the petitioner in the years 1950 and 1951 was because under respondent's determination the allowance of the standard deduction in lieu of itemized deductions resulted in a lesser tax for petitioner. We, therefore, hold that petitioner is entitled to a deduction for income taxes paid to the State of New York in the years 1950 and 1951 in the amounts of $476.54 and $165.25, if these amounts, when added to the other allowable deductions as found herein for the years 1950 and 1951, exceed the standard deduction allowed by respondent. While the amount of $50 claimed by petitioner for sales and sundry taxes was admittedly an estimate, it is a reasonable minimum estimate for New York City sales taxes paid by petitioner for each year here involved considering the length of time that petitioner lived in hotels and ate in restaurants in New York each such year. [2] We, therefore, hold that petitioner is entitled to a deduction in the amount of $50 in each of the years here *362 involved for sales taxes paid to New York City. Petitioner claimed deductions in the amounts of $1,030.43, $1,553.30, and $700 for foreign taxes paid. The evidence is totally insufficient to support these claimed deductions. By what authority the alleged taxes were imposed, upon whom they were imposed, or whether they were in fact taxes as distinguished from fees or service charges of some type is not shown. Respondent's disallowance of petitioner's claimed deductions for foreign taxes is sustained. Respondent disallowed the amounts of $100, $125, and $300 claimed by petitioner in the years 1950, 1951, and 1952 as miscellaneous deductions. Petitioner testified that in each of the years here involved she sent telegrams and made telephone calls from New York City to Washington in connection with an effort to persuade the Alien Property Custodian to agree to leases on the building at 902 Broadway and to sign such leases in order that rentals might be collected. She also referred to cables to and from the accountant who handled her personal accounting problems. *363 Petitioner stated that the total cost of postage, telephone calls, and cables to her in these years was in excess of the amounts claimed by her, but she and her accountant had arrived at the amounts claimed as a minimum. It is apparent from the record that some of the cables and telephone calls for which petitioner paid and postage and similar expenses were in connection with the state tax problems of her husband's estate and other matters which have not been shown to be for the production of income or the maintenance or management of property held for the production of income. It is also clear that some of these cables, telephone calls, telegrams, and letters concerned the obtaining of leases and distribution of the monthly income from the building at 902 Broadway. Respondent's agent was able to verify to his satisfaction the miscellaneous deductions of $100 and $125 claimed by petitioner in 1950 and 1951, respectively. After considering petitioner's testimony of the extent to which she sent telegrams and cables and made long-distance telephone calls, we have concluded that she is entitled to deductions in the amounts of $100 and $125 for expenses in the production of income in the *364 years 1950 and 1951 and hold that respondent erred in disallowing the miscellaneous deductions claimed in these amounts if these amounts, when added to the other deductions as determined herein, exceed the standard deduction. Petitioner gave no explanation of the portion of the $300 claimed by her as miscellaneous deductions in 1952 that represented notary fees. There is no basis in the record for finding that petitioner incurred any greater amount of expenses for cables, telegrams, telephone calls, postage, and stationery for the production of income in 1952 than in 1951. We, therefore, hold that petitioner is entitled to a miscellaneous deduction because of such expenditures in the amount of $125 for the year 1952 and sustain respondent's disallowance of the deduction claimed in this year to the extent of $175 for failure of proof on the part of petitioner. The final issue for decision is petitioner's claimed deduction for traveling expenses. Petitioner has shown that she made trips from France to the United States in each of the years here involved and expended amounts for meals and lodging while in New York City. Although the evidence is far from satisfactory on the precise amount *365 spent by petitioner on these trips, we have set forth in our findings the amounts which, in our opinion, have been substantiated by petitioner. The testimony of petitioner as to the purpose of these trips is vague and indefinite. She did state that the trips were in connection with the administration of her husband's estate, dealing with the Alien Property Custodian, and negotiating with respect to the sale of the property at 902 Broadway. All of these activities might well have been undertaken by petitioner primarily in connection with the estate tax liability determined against her husband's estate. There had been a determination that petitioner's husband, at the time of his death, owned a 64.2 per cent interest in the building. Petitioner needed to have the ownership interests settled. It appeared from petitioner's testimony that the chief negotiations in connection with the sale of the building would have occurred after the years here involved since at the date of the confirmatory deed on August 26, 1952, the Kaufman Syndicate is not shown to have owned an interest in the building. Certainly, some of the trips were made primarily in connection with the estate tax liability determined *366 against her husband's estate. Although she testified as to other activities engaged in while in New York, this imprecise testimony does not support a conclusion that these trips were made primarily for any purpose other than to perform duties as executrix of her husband's estate in view of her sworn allegation in the District Court case that all of her trips from 1947 through July 1956 were solely for the purpose of carrying on her duties as executrix. Petitioner does not specifically contend that she was engaged in a trade or business as an executrix or as a manager of property, but such a contention seems inherent in her claim that these travel expenses constituted ordinary and necessary business expenses. If petitioner were engaged in any trade or business, either as an executrix or as a manager of the property at 902 Broadway, the location of such business was in New York. Petitioner had no business interests in Paris. Her trade or business, if any, was in New York. For this reason, petitioner has failed to establish that her travel expenses from Paris to New York and living expenses in New York would constitute ordinary and necessary business expenses. Commissioner v. Flowers, 326 U.S. 465 (1946). *367 Petitioner also argues that these travel expenses are ordinary and necessary expenses for the maintenance, conservation, and management of her property. In support of this contention she relies on the fact that the amounts were not allowed as deductions in determining the estate tax liability of her husband's estate or as a charge against the estate in the New York Surrogate Court. [3] The fact that these claimed travel expenses have not been allowed as administration expenses of petitioner's husband's estate does not relieve petitioner of showing that the amounts were ordinary and necessary expenses. Because of petitioner's failure of proof in this respect, the expenses are not deductible as expenses in the management, conservation, or maintenance of income-producing property. Cf. Ralph D. Hubbart, 4 T.C. 121 (1944). Furthermore, there is no reason to conclude that under the provisions of section 162(e) of the 1939 Code, such amounts would be properly deductible by petitioner in determining her personal income tax liability if they had been shown to constitute ordinary and necessary expenses of the estate. *368 The estate of a decedent under the Federal tax law is an entity separate from the heirs. Mellott v. United States, 257 F. 2d 798 (C.A. 3, 1958). Cf. Guaranty Trust Company of New York, Executor, 30 B.T.A. 314 (1934). *369 Petitioner has failed to show that respondent erred in not allowing her to deduct the expenses of her trips from Paris to New York and her meals and lodging in New York in determining her income tax liability for each of the years here involved. Decision will be entered under Rule 50. Footnotes
1. Sec. 23(o) Charitable and Other Contributions. - In the case on an individual, contributions or gifts payment of which is made within the taxable year to or for the use of: * * *
(2) a corporation, trust, or community chest, fund, or foundation, created or organized in the United States or in any possession thereof or under the laws of the United States or of any State or Territory or of any possession of the United States, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals. no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation. * * *↩
2. N.Y.C. Administrative Code, ch. 41, tit. N, sec. 41-2.0 imposed a city sales tax during all of the years here involved.↩
3. Petitioner states in her brief: It is a fact that originally the petitioner, as Executrix, asked to have these necessary expenses for the protection of her property charged against the funds of the Estate and only placed in her return of 1952 $3,000 of these expenses as deductions against her individual taxes, but following the decision of Surrogate Cox in the accounting proceedings before the Surrogate, which decision has been offered in evidence and marked Petitioner's Exhibit No. 5, wherein the Surrogate refused to charge these expenses against the Estate and indicated that his ruling thereon was predicated upon the fact that the property was the property of Louise K. Herter, the individual, now asks that these necessary expenses be allowed to her in a reasonable amount as deductions against her income taxes in the years in question. The report of the Surrogate (not officially reported) stated in part: * * * The executrix has asserted a claim for administration expenses in an amount almost three times the value of the gross estate as reported in her account. Most of these expenses were purportedly incurred in traveling to and from Europe and for living expenses while she was in New York. The occasions for these repeated trips have not been established and the charging of these excessive expenses to the estate has resulted in a purported insolvency which does not permit payment of any part of the claim of creditors. The executrix is the sole legatee under the will and in this circumstance the only ruling required is that the socalled administration expenses are disallowed to the extent necessary to provide funds for the payment of estate taxes and all creditors' claims in full. While we do not believe that the determination of the Surrogate on facts presented to him which have not been shown to be the same as the facts presented at the trial of the instant case is entitled to any weight in disposing of the issue herein, we note that we do not agree with petitioner's conclusion as to reasons for the Surrogate's ruling.↩