**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ST. JOSEPH, a Federal Savings and Loan Association, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 1426.**

United States District Court
W. D. Missouri,
St. Joseph Division.
June 17, 1968.

Hoskins, King, Springer & McGannon, Kansas City, Mo., Strop, Watkins, Roberts & Hale, St. Joseph, Mo., Philip J. Erbacher, of Hoskins, King, Springer & McGannon, Kansas City, Mo., for plaintiff.

John DeBruyn, Tax Div., Dept. of Justice, Washington, D. C., and Calvin K. Hamilton, U. S. Dist. Atty., Kansas City, Mo., for defendant.

ORDER OVERRULING DEFEN-
DANT'S MOTION TO DISMISS—
MEMORANDUM OPINION, FIND-
INGS OF FACT AND CONCLU-
SIONS OF LAW

DUNCAN, Senior District Judge.

On April 7, 1967, plaintiff, the First Federal Savings & Loan Association, chartered under the laws of the Federal Savings & Loan Association Act, with its principal place of business in St. Joseph, Missouri, filed this suit against the United States, as authorized by the Internal Revenue Code of 1954, Title 26 U.S.C. § 1346 as amended, to recover the income taxes which it alleged were erroneously assessed and collected by the defendant on the amounts paid to the Federal Savings & Loan Insurance Corporation, as additional premiums under Title 12, U.S.C. § 1727(d)[1], for the years 1963, 1964 and 1965.

For the respective years 1963, 1964 and 1965, the plaintiff paid income taxes in the amounts of $39,052.12, $34,467.46 and $30,448.35. For each of those years the plaintiff also paid to the Federal Savings & Loan Insurance Corporation (hereinafter referred to as FSLIC), the sums of $12,353.82, $13,399.34 and $15,090.36 respectively as required by Title 12, U.S.C. § 1727(b) (1)[2] as insurance premiums. Each of the latter amounts was deducted from gross income as ordinary and necessary business expenses and are not in controversy here.

In addition to the amounts paid as § 1727(b) (1) premium payments, the plaintiff also paid for the respective years, the sums of $20,651.36, $32,206.18 and $28,398.10 which were required of it by Title 12 U.S.C. § 1727(d) as "additional premiums". These amounts were not deducted by plaintiff.

It is plaintiff's contention that it erroneously included in its net income for tax purposes the amounts paid by it to the FSLIC under 1727(d) as premium contributions, believing that it was liable for income tax on the amount so paid, and that it later determined that the amounts in question had been paid and collected erroneously and should

1. "(d) Each insured institution, except as otherwise provided in this section, shall annually pay to the Corporation, at such time and in such manner as the Corporation shall by regulations or otherwise prescribe, an additional premium in the nature of a prepayment with respect to future premiums of such institution under subsection (b) of this section equal to 2 per centum of the net increase in all accounts of its insured members during the next preceding calendar year, less an amount equal to any requirement, as of the end of such calendar year, for the purchase of stock of the Federal Home Loan Bank of which such institution is a member, calculated in accordance with the provisions of subsection (c) of section 1426 of this title and without regard to any net increase during such calendar year in its holdings of such stock, and such prepayments shall be credited to the Secondary Reserve: *Provided*, That in the case of an insured institution which was not an insured institution at the beginning of such next preceding calendar year the 2 per centum aforesaid shall be 2 per centum of the net increase in all accounts of its insured members during that part of said calendar year which begins with the close of the day on which such institution becomes an insured institution and the *amount deducted from such 2 per centum* under the foregoing provisions of this sentence shall not exceed one-half of such 2 per centum as calculated in accordance with this proviso. The Federal Home Loan Bank Board shall by regulations or otherwise provide for the furnishing to the Corporation of all necessary information with respect to Federal Home Loan Bank stock."

2. "(b) (1) Each institution whose application for insurance is approved by the Corporation shall pay to the Corporation, in such manner as it shall prescribe, a premium for such insurance equal to one-twelfth of 1 per centum of the total amount of all accounts of the insured members of such institution plus any creditor obligations of such institution. Such premium shall be paid at the time the certificate is issued by the Corporation under section 1726 of this title, and thereafter annually, except that under regulations prescribed by the Corporation such premium may be paid semi-annually."

have been deducted as an ordinary and necessary business expense under Title 26 U.S.C. § 162(a).[3] The amounts sought to be recovered are as follows: Count I for the year 1963—$4,637.05; Count II for the year 1964—$6,961.52 and Count III for the year 1965—$6,913.31.

There are two issues now before the court, the first is a Motion to Dismiss for lack of jurisdiction over the subject-matter filed by the Government prior to the time the case came on for trial, and the second is the question of whether plaintiff is entitled to deduct from its net income for the years in question under title 26 U.S.C. § 162(a), the amount of its premium payments required by Title 12 U.S.C. § 1727(d).

With respect to the Motion to Dismiss, the facts are that the attorney for the defendant addressed a letter to Philip J. Erbacher, counsel for the plaintiff, on December 1, 1967, in which it was stated among other things that an administrative settlement had been approved on behalf of the Attorney General, and that the Chief Counsel had been authorized to schedule payment of such taxes as the Service computes to be due under the issues raised by the pleadings plus interest.

The letter further advised that a check would be delivered by the United States Attorney at Kansas City, Missouri, to the taxpayer or to its counsel of record. It was further stated that:

> "It is hereby stipulated and agreed that the above-entitled action be dismissed with prejudice, each party to bear its own costs.", and that "The terms of the settlement should *not* be included in the stipulation."

Counsel for plaintiff replied to that letter on December 5, 1967, stating among other things that there was no agreement as to "* * * this manner of disposing of the case," and further that:

"It is our preference that the matter proceed to trial as set for December 11, and that the partial stipulation, presently signed and awaiting filing, be filed this week with the Clerk. Thereafter, if at the opening of the trial the defendant wishes to accept judgment by open statement in Court, the matter can then be disposed of by entry of the judgment and satisfaction thereof."

A check in the amount of $18,771.42 was tendered by the attorney for the defendant to plaintiff's counsel in the Court's chambers on December 6, 1967. This tender was refused by plaintiff's counsel solely on the ground that it was entitled to a trial of the issues and a judgment. The amount tendered was not the amount sought and this was raised by plaintiff at pre-trial conference. However, it was not relied upon as a ground for rejecting the offer. Defendant then offered to pay whatever the correct amount was computed to be but plaintiff again rejected the offer.

At the conclusion of the pre-trial conference the Court directed that the check be deposited with the Clerk of the Court, to be held by the Clerk pending the outcome of the case.

At the trial on December 11, 1967, it was discovered that the computation of the amount offered had not taken into account the amount claimed in 1965 which was attributable to the alleged deduction for additional premium payments, which amount has been determined to be $724.34 plus interest.

During the course of the trial counsel for defendant orally tendered the entire amount due without producing same, which was orally rejected by plaintiff's counsel, who stated no reason for the rejection thereof.

On the same day as the pre-trial conference, i. e., December 6, 1967, the defendant filed a Motion to Dismiss, an affidavit in support of that motion, and

---

**3.** "(a) In general.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—"

suggestions in support thereof. This was countered with a brief in opposition to which a reply was filed, all of which were taken under consideration by the court for disposition following the submission of the case on the merits.

It is the defendant's contention that inasmuch as a suit for refund of taxes alleged to have been erroneously or illegally assessed or collected is in the nature of an action for money had and received, the case becomes moot and consequently the Court lacks jurisdiction over the subject-matter where the amount of taxes in question are in fact refunded or tendered.

█ Although it is true that where litigation is based upon a money demand and during the pendency of such litigation in the trial or appellate courts the money has been paid and full compliance has been made with the demands in the litigation the issue then becomes moot and the Court lacks jurisdiction over the subject matter, H. L. Gwalter & Co. v. United States, 30 C.C.P.A. 42 (1942), nevertheless, there must be a (1) payment, and (2) full compliance must have been made with the demands of the litigation.

As to the first requisite, that of payment, it is clear that there was no payment made in the instant case but only a tender of money made by check and so made only after the suit had already been filed. This gives rise to the question of whether a tender of the amount claimed after commencement of the suit amounts to a payment. This in turn draws attention to the tender itself, for if the tender is not good then it matters not if it did or did not have the effect of a payment. We believe that not only was the tender insufficient, but that even had it been sufficient it would not have had the effect of a payment.

"As a general rule, in the absence of a statute to the contrary, a tender after suit filed is ineffectual." 86 C.J.S. Tender § 16, p. 567. "To the contrary" is Title 28 U.S.C., Federal Rules of Civil Procedure 67 which provides as follows:

"Rule 67. Deposit in Court—

In an action in which any part of the relief sought is a judgment for a sum of money or the disposition of a sum of money or the disposition of any other thing capable of delivery, a party, upon notice to every other party, and by leave of court, may deposit with the court all or any part of such sum or thing. Money paid into court under this rule shall be deposited and withdrawn in accordance with the provisions of Title 28, U.S.C., §§ 2041, and 2042; the Act of June 26, 1934, c. 756, § 23, as amended, (48 Stat. 1236, 58 Stat. 845), U.S.C. Title 31, § 725v; or any like statute. As amended Dec. 29, 1948, effective Oct. 20, 1949."

█ It is readily apparent from a reading of the above that the tender made in the instant case did not comply with the Federal Rule. Leave of court was not obtained to deposit the money with the Court, but rather it was the Court who directed that the check be deposited with the Clerk and held by him pending the outcome of the case. Since the attempted tender was not made in accordance with the Rule, it was not sufficient as a tender.

██ Even if the tender had been sufficient, it would not have had the effect of a payment due to the fact that, "* * * tender after suit brought * * * merely operates as a termination of liability for interest and costs accruing thereafter." Bendix Aviation Corporation v. Glass, 81 F.Supp. 645 (E.D. Pa.1948). Furthermore, "where the statute permits a tender after action brought, as discussed supra § 16, such tender does not bar the further prosecution of the action; nor is it a defense to the action." 86 C.J.S. Tender § 50, p. 581.

█ As to the second requisite of full compliance with the demands in the litigation, it is our belief that even if the tender had been sufficient and had had the effect of a payment, full compliance with the demands in the litigation would not have been accomplished and would

**482**

thus have prevented the cause from becoming moot in that the plaintiff sought as a part of its relief a determination of the question of whether the Sec. 1727(d) additional premium payments were deductible under Sec. 162(a) of the 1954 Code and the defendant was unwilling to concede that point.

One of the grounds for plaintiff's refusal to accept the offer of payment was that the question of whether or not the assessments were deductible is a question that will arise annually and will have to be contested each time the tax becomes due. Whether or not this is true, we cannot, of course, say at this time, but we do feel that the plaintiff is entitled to have the question of whether or not the amounts assessed and paid as additional premiums are deductible as ordinary business expenses, settled.

Certainly the acceptance of a payment would not settle that question, and whether or not in the future the Service would allow a deduction of the amount as business expense, would be entirely within the discretion of the Service.

For the above and foregoing reasons, the Motion to Dismiss is overruled.

4. "(b) (2) If, at the close of any December 31, the Primary Reserve equals or exceeds 2 per centum of the total amount of all accounts of insured members and creditor obligations of all insured institutions as of such close, no premium under paragraph (1) of this subsection shall be payable by any insured institution with respect to its premium year beginning during the year commencing on May 1 next succeeding such December 31, except that the foregoing provisions of this sentence shall not be applicable to any insured institution with respect to any of the twenty premium years beginning with the premium year commencing with the date on which such certificate is issued.

5. "(e) The Corporation, in accordance with such regulations as it may prescribe, shall credit to the Secondary Reserve, as of the close of each calendar year a return on the outstanding balances of the Secondary Reserve during such calendar year as determined by the Corporation, at a rate equal to the average annual rate of return to the Corporation

Under the provisions of the statute, Title 12 U.S.C. § 1727(b) (1), every savings and loan association, when it has been approved by the Corporation, is required to pay premiums which are channeled into a Primary Reserve fund in an amount equal to ¹⁄₁₂th of 1% of all its insured accounts plus creditor obligations until the Primary Reserve under the control of the Corporation has reached 2% of the total amount of all accounts of insured members and creditor obligations of all insured institutions. Title 12 U.S.C. § 1727(b) (2)[4]. This fund is to be used by the Corporation to pay losses of any savings and loan association, and if at any time the fund drops below a certain percentage of such insured accounts, the Corporation may levy an additional premium in the nature of a prepayment to be credited to a Secondary Reserve fund in an amount equal to 2% of the net increase in all accounts of its insured members. Title 12 U.S.C. § 1727(d). This fund may not be used for the purpose of paying such losses until the Primary Reserve fund has been exhausted. [Title 12 U.S.C. § 1727(e) [5].]

during the year ending at the close of November 30 of such calendar year, as determined by the Corporation, on the investments held by the Corporation in obligations of, or guaranteed as to principal and interest by, the United States. Except as provided in subsections (f) and (g) of this section, the Secondary Reserve shall be available to the Corporation only for losses of the Corporation and shall be so available only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses. No right, title, or interest of any institution in or with respect to its pro rata share of the Secondary Reserve shall be assignable or transferable, whether by operation of law or otherwise, except to such extent as the Corporation may by regulation or otherwise provide for transfer of such pro rata share in cases of merger or consolidation, transfer of bulk assets as defined by the Corporation by regulation or otherwise for the purposes of this sentence, and similar transactions as so defined."

There is to be credited to this Secondary Reserve fund its pro rata share of the earnings from investments in obligations of the United States in which this Secondary Reserve fund shall have been invested. [Title 12 U.S.C. § 1727(e)]. This fund remains on the books of the Corporation as the property of the Federal Savings and Loan Associations and the earnings of this fund are added to the Secondary Reserve.

Aside from being subject to payment of losses of the FSLIC, there are three different dispositions which can be made of the funds in the Secondary Reserve all of which are contingent on the following: (1) if the aggregate of the Primary and Secondary Reserves equal or exceed 2% of the total of all accounts of the insured members and creditor obligations but the Primary Reserve does not equal or exceed said 2% then the duty to make § 1727(d) premium payments ceases and the pro rata share of the Secondary Reserve is used to make prepayments toward the § 1727(b) (1) premium, as provided in 1727(g)[6]; (2) if plaintiff liquidates or takes on state charter status as provided in Title 12 U.S.C. § 1727(f)[7], then its pro rata

6. "(g) If, at the close of any December 31, the aggregate of the Primary Reserve and the Secondary Reserve equals or exceeds 2 per centum of the total amount of all accounts of insured members and creditor obligations of all insured institutions but the Primary Reserve does not equal or exceed such 2 per centum, no insured institution shall be obligated to make any prepayment under subsection (d) of this section during the year beginning with May 1 next suceeding such close, and each insured institution's pro rata share of the Secondary Reserve shall be used, to the extent available, to discharge such institution's obligation for its premium under subsection (b) of this section for the premium year beginning in such year; and the suspension of obligation to make such prepayments and the use of such pro rata shares as provided in this sentence shall continue unless and until the next sentence or the last sentence of this subsection shall become operative. If, at the close of any December 31 occurring before the last sentence of this subsection shall become operative, the aggregate of the Primary Reserve and the Secondary Reserve is not at least equal to 1¾ per centum of the total amount of all accounts of insured members and creditor obligations of all insured institutions, (i) the obligation of insured institutions to make prepayments under subsection (d) of this section shall resume on May 1 next following such December 31 and shall continue unless and until the first sentence or the last sentence of this subsection shall become operative, and (ii) the use of any insured institution's pro rata share of the Secondary Reserve under the first sentence of this subsection shall terminate with respect to its premium under subsection (b) of this section for the premium year beginning during the calendar year commencing on May 1 next succeeding such December 31, and such termination shall continue unless and until the first sentence of this subsection shall become operative. If, at the close of any December 31, the Primary Reserve equals or exceeds such 2 per centum, the Corporation shall, at such time (which shall be the same for all insured institutions and shall not be later than May 1 next succeeding such close) and in such manner as the Corporation shall determine, pay in cash to each insured institution its pro rata share of the Secondary Reserve and shall not, after such time, accept or receive further prepayments under subsection (d) of this section."

7. "(f) If (i) the status of an insured institution as an insured institution is terminated pursuant to any provision of section 1730 of this title or the insurance of accounts of an insured institution is otherwise terminated, (ii) a conservator, receiver, or other legal custodian is appointed for an insured institution under the circumstances and for the purpose set forth in subsection (d) of section 1724 of this title, or (iii) the Corporation makes a determination that for the purposes of this subsection an insured institution has gone into liquidation, the obligations of such institution to make prepayments under subsection (d) of this section, including any prepayments as to which such institution is obligated at the time of such termination, appointment, or determination, shall cease, and the Corporation shall pay in cash to such institution its pro rata share of the Secondary Reserve, in accordance with such terms and conditions as the Corporation may prescribe by regulations or otherwise, or, at the option of the Corporation, the Corporation may apply the whole or any part of the amount

share will be paid to it in cash or applied to cover any obligations that it may owe to the Corporation, and (3) if the Primary Reserve equals or exceeds 2% then the pro rata share of each institution will be paid to it in cash as provided in § 1727(g) supra.

There is no question about the amount paid into the Primary Reserve fund being deductible as a business expense under Title 26 U.S.C. § 162(a). Nevertheless, the Service has taken the following contrary position in Revenue Ruling 66–49, 1966–1 CB, page 36, with respect to § 1727(d) premium payments:

"The additional premium prepayments which an insured savings and loan institution is required to pay to the Federal Savings and Loan Insurance Corporation under the provisions of section 404 of the National Housing Act, as amended, are not deductible when paid and may be deducted only when any possibility of their return is precluded."

Further, it is the defendant's contention that the funds in question were deposits for a contingent liability and not business expenses because: (a) the fund was not consumed and (b) the plaintiff retained a right to recapture the funds. Defendant further states that if, arguendo, the funds can be considered as an expenditure, the expenditure was in the nature of a capital investment, i. e., an expenditure which secures benefits which have a useful life extending beyond the year in which incurred, and are therefore not deductible as business expenses in the year paid.

With this interpretation we need not and cannot agree. Manhattan General Equipment Co. v. Commissioner of Internal Revenue, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1963) informs us that:

"The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. [Citing cases.] And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable."

We believe that the above cited regulation is not reasonable and does not carry into effect the Will of Congress as expressed by the statute.

Regardless of whether or not the fund was consumed or the plaintiff had a right to recapture the fund, the fact remains that plaintiff was subject to the basic liability to pay "an additional premium in the nature of a prepayment." This premium, regardless of what kind of a fund the premium proceeds were applied to, was paid with respect to in-

which would otherwise be paid in cash toward the payment of any indebtedness or obligation, whether matured or not, of such institution to the Corporation, then existing or arising before such payment in cash; *Provided*, That such payment or such application need not be made to the extent that the provisions of the exception in the last sentence of subsection (e) of this section are applicable. The Corporation in its discretion may provide by regulations or otherwise for the reinstatement in whole or in part, upon such terms and conditions as to payment or otherwise as it may prescribe, of the pro rata share of an in-

stitution in the Secondary Reserve in the event that such status or such insurance is restored by action of the Corporation or of a court in reversing or setting aside such termination, or in the event that, after such appointment or such termination, an institution is restored to operation as an insured institution, and for the payment, waiver, or other treatment in whole or in part of any prepayments which, in the absence of the first sentence of this subsection, would have accrued under subsection (d) of this section or would be payable thereunder."

surance coverage and was based, to a certain extent, upon the risk of loss.

Further, and of even more significance, is the fact that all of the premium proceeds were subject to being completely consumed in the event of a loss. The only real difference between the application of the premium proceeds paid under § 1727(b) (1) and those paid under § 1727(d) is the fact that the Secondary Reserve fund was not to be used to cover losses of the FSLIC until it was determined that other accounts available for loss were insufficient for that purpose.

Nevertheless, a premium was paid for insurance which covered a specified risk the proceeds of which were subject to payment of losses with respect to that risk, and although there existed the remote possibility that the premium payment could be recovered or utilized to prepay other premium liabilities, that fact should not affect the deductibility of the premiums but should be considered only when those contingencies arise and then, should it be determined that plaintiff has realized income, appropriate taxes should be levied thereon.

There appears to be no precedent dealing directly with this problem or with these statutes. The defendant cites the case of Wichita State Bank and Trust Co. v. Commissioner, 69 F.2d 595 (5th Cir. 1934) which is clearly distinguishable from the instant case and which tends in its reasoning to support the position of the plaintiff. Also distinguishable is the case of United States v. Weber Paper Co., 320 F.2d 199 (8 Cir. 1963) which involved a situation where the Government refused to allow as a deduction under § 162(a) premiums paid to a reciprocal or inter-insurance exchange for flood insurance because 99% of premiums paid, which were equal to the face amount of the policies, were recapturable at the end of a policy year on 60 days notice.

The court held that the premium payments were deductible. In both this case and in the instant case there were premiums paid for insurance protection against specific risks and in both cases there was the possibility of recoupment under certain conditions. Also in both cases the entire sum paid was subject to being consumed in order to pay any losses. The premium payment was deductible in the *Weber Paper Co.*, case and for the same reason the premium in the instant case should be deductible.

■ It is therefore our conclusion that the premium payments made by the plaintiff in respect to the requirements of Title 12 U.S.C. § 1727(d) are deductible as ordinary and necessary business expenses.

■ This brings us to the question of whether the premium payments required by Title 12 U.S.C. § 1727(b) (1) for the year 1965 are deductible in full for that year as contended by the taxpayer or whether that portion thereof which is applicable to coverage for the year 1966 should be prorated in accordance with the Government's contention.

During 1965 the plaintiff changed its method of accounting with respect to the payment of § 1727(b) (1) premiums. Plaintiff had been regularly accounting for these prepaid premiums on a cash basis, but in April, 1965 changed to an accrual method, accruing the sum of $1,257.53 each month although payment was made in April for the first half of the insurance year and in October for the second half of the insurance year. Consistent with its change in accounting, plaintiff filed its return reporting payment of insurance premiums in the amount of $11,317.77. It now seeks to deduct an additional amount of $3,772.59 which is the difference between that which it deducted and that which it paid, i. e., $15,090.36.

Plaintiff contends that since it paid this amount during 1965, and since it pays taxes on a *cash basis* that it is entitled to deduct the whole amount paid. On the other hand, defendant contends that since the $3,772.59 figure represents insurance coverage for the year 1966, that it should not be allowed to deduct that figure in 1965.

Defendant bases its contention on the cases of Commissioner v. Boylston Market Association, 131 F.2d 966, 144 A.L.R. 528 (1 Cir. 1942); Peters v. Commissioner, 4 T.C. 1236; Bassett v. Commissioner of Internal Revenue, 26 T.C. 619; Williamson v. Commissioner, 37 T.C. 941 (1962) and G.C.M. 23587, 1943 Cum. Bull. 213.

To the contrary, plaintiff relies on the case of Waldheim Realty and Investment Company v. Commissioner, 245 F.2d 823 (8 Cir. 1957), which in ruling that a cash basis taxpayer could deduct insurance premiums as business expenses in the year that the premiums were paid though part of the premiums were for coverage in subsequent years, stated:

"The problem of when a cash basis taxpayer should deduct prepaid insurance premiums on policies running more than one year has caused considerable difficulty. The Commissioner in 1934 ruled that the cost of prepaid insurance running more than one year must be prorated. G.C.M. 13148, 1934 Cum.Bull. 67. After the decision in DeBlois, supra, the Commissioner reversed his position in conformity with that decision. G.C.M. 20307, 1938 Cum.Bull. 157. After the Boylston Market decision, supra, the Commissioner reverted to his original position requiring proration. G.C.M. 23587, 1943 Cum.Bull. 213.

\*   \*   \*   \*   \*   \*

We believe that the opinion in the DeBlois case is more persuasive than the Boylston Market opinion."

Defendant contends that the Williamson v. Commissioner case, supra, which involved delay rental payments, distinguished the Waldheim Realty and Investment Company v. Commissioner case, supra, on the ground that the latter decision was based on a "consistent practice over a long period of years."

In this respect we are in agreement with the defendant and do believe that because plaintiff had not consistently engaged in the practice over a long period of years, it is precluded from taking advantage of it now.

In so holding, we are mindful of both the desirability of maintaining a uniform and consistent method of regulating the assessment and collection of taxes and of the fact that, \* \* \* it is extremely doubtful whether any substantial difference would result over a period of years." Waldheim Realty and Investment Company v. Commissioner, supra, at p. 827, which further states that, "\* \* \* it is very likely that the variance in tax would be extremely small, and the possibility is that computation under the taxpayer's theory [of prorating] would somewhat favor the Government because of the tendency on the part of Congress to constantly raise the tax rates."