LINCOLN SAVINGS & LOAN ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 325-67. Filed October 21, 1968.

*Adam Y. Bennion, A. Calder Mackay,* and *Richard N. Mackay,* for the petitioner.

*James A. Thomas,* for the respondent.

90

OPINION

Raum, *Judge:* Petitioner, a savings and loan association licensed by the State of California and doing business in the Los Angeles area, has since 1938 insured the savings accounts of its depositors with the Federal Savings and Loan Insurance Corporation (the "FSLIC"), pursuant to the provisions of title IV of the National Housing Act, as amended. (12 U.S.C. sec. 1724 *et seq.*) It pays an annual "premium for such insurance" in an amount equal to $\frac{1}{12}$ of 1 percent of the total amount of all its savings accounts and creditor obligations, as provided in section 1727(b)(1). Since 1962, as the result of amendments made to the National Housing Act, petitioner has been required to make further annual payments to the FSLIC under section 1727(d), hereinafter sometimes referred to as "section 1727(d) payments," equal to 2 percent of any net increase in its insured accounts during the previous year, but reduced in the case of an insured institution, such as petitioner, which is also a member of a Federal home loan bank, by the amount of any required purchase of stock in such Bank for that year. These section 1727(d) payments are described in the statute as "additional premium[s] in the nature of * * * prepayment[s] with respect to future premiums." In 1963, the only year here in issue, petitioner paid its annual insurance premium for the year in the amount of $135,760.52, and made its section 1727(d) payment in the amount of $882,636.86. Both sums were deducted on its 1963 Federal income tax return as "Federal insurance premiums." The Commissioner, while not disputing petitioner's right to deduct its regular annual insurance

premium, disallowed in full the deduction of $882,636.86 claimed for the additional section 1727(d) payment. The sole issue for decision is whether this latter payment was an ordinary and necessary expense of petitioner's business in 1963, or a capital expenditure deductible, if at all, only in later years to the extent that it ceased to be an asset of petitioner.

Although described in the statute as "an additional premium in the nature of a prepayment with respect to future premiums," the section 1727(d) payment is neither an "additional premium," in the sense of being a mere increase in the annual insurance premium as contended by petitioner, nor a "prepayment with respect to future premiums," at least insofar as the ordinary prepaid insurance premium is taken as a standard. The National Housing Act is not, of course, a revenue statute, and the label attached to section 1727(d) payments therein is not, and was not intended to be, conclusive in the determination of how these payments should be treated for Federal tax purposes. See *McMillan Mortgage Co.*, 36 T.C. 924, 928. The label is at any rate ambiguous, though if we were to give it binding effect here, we should most certainly adopt the characterization of "prepayment" as controlling, and would therefore have to deny petitioner a current deduction for its section 1727(d) payment under a long line of decisions by this Court holding that prepaid insurance premiums are capital expenditures to be expensed over the years in which coverage is actually obtained. *Higginbotham-Bailey-Logan Co.*, 8 B.T.A. 566, 577; *George S. Jephson*, 37 B.T.A. 1117, 1119–1120; *Martha R. Peters*, 4 T.C. 1236, 1242; *Louise K. Herter*, 20 T.C.M. 78, 86, 30 P-H. Memo. T.C. par. 61,019. See and compare *Commissioner* v. *Boylston Market Assn.*, 131 F. 2d 966 (C.A. 1), affirming a Memorandum Opinion of the Board of Tax Appeals, with *Waldheim Realty & Inv. Co.* v. *Commissioner*, 245 F. 2d 823 (C.A. 8), reversing 25 T.C. 1216. But regardless of whether the section 1727(d) payment may properly be characterized as a prepaid insurance premium, we reach the same ultimate result, for an analysis of the substantive provisions of section 1727 convinces us that this payment, however labeled, is in the nature of a capital outlay and is therefore not deductible as an expense in the year that it is made.

That the section 1727(d) payment is qualitatively different from the regular annual insurance premium payable under section 1727(b)(1), and constitutes something more than a mere increase in the premium rate, seems to us beyond question. Regular annual premiums are part of the gross income of the FSLIC and, along with its income from investments, are used to meet the FSLIC's operating expenses and insurance losses, if any, for the year. To the extent that such premiums are not so used, they are transferred, as part of the FSLIC's net income

for the year, to the "Primary Reserve," the FSLIC's general reserve which contains its cumulative net income or "retained earnings" and which is available to meet the FSLIC's insurance losses if its income in any year is insufficient for this purpose. Section 1727(d) payments, on the other hand, are not considered as income by the FSLIC, and are not ordinarily available to meet the annual expenses and losses of the Corporation. Instead, the FSLIC is required by statute to credit all such payments directly to a "Secondary Reserve," which is to be used "only for losses of the Corporation and shall be so available *only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses.*" Sec. 1727(e). (Emphasis added.) Thus, instead of being taken into income, freely available to meet expenses and losses of the current year, the section 1727(d) payment is credited directly to an account, rather like a capital account, which may be applied against losses only on the event that the regular insurance premiums for the year, the Corporation's other income, and its retained earnings of prior years have all been depleted. It cannot, therefore, be accurately termed a premium for insurance coverage in the year of payment, but, at least initially, is in reality a capital investment in the FSLIC, part of a pool of capital available to the FSLIC for the payment of losses in the event of emergency.

Furthermore, when the regular insurance premiums paid by insured institutions under section 1727(b)(1) are received by the FSLIC, they lose their distinctive character as premiums and become merely part of the gross income of the Corporation; the insured institution retains no rights in respect of such sums, other than the right to insurance coverage for the current year, and its premium, once paid, is lost to it forever. Payments made under section 1727(d), however, stand on quite a different footing. Such payments, as noted above, are immediately segregated in the "Secondary Reserve," and the FSLIC is directed by statute to credit the outstanding balance in this account, on an annual basis, with a "return" computed "at a rate equal to the average annual rate of return to the Corporation * * * on the investments held by the Corporation in obligations of, or guaranteed as to principal and interest by, the United States." Sec. 1727(e). What is more, each insured institution maintains an interest in a prorata share of the Secondary Reserve, and is annually furnished with a statement of its account by the FSLIC, which keeps a separate account for each insured institution. That annual statement discloses all section 1727(d) payments made by the insured institution, the interest or return earned by the account, any debits that may have been charged against the account, and, finally, the new balance in the account as of the end of the year. Thus, for the years 1962–67, petitioner's account, set forth in our findings, reflects various credits (section 1727(d) payments and

interest or return), no debits, and a balance of $4,922,115.46 in its favor, representing its prorata share in the Secondary Reserve as of December 31, 1967.

While petitioner's prorata share of the Secondary Reserve is not, as a general rule, assignable or transferable, "by operation of law or otherwise," the value of such share may be fully realized through its transfer to another insured institution in a merger, consolidation or bulk sale; petitioner may even receive the value of its share from the FSLIC in cash if (1) its insured status is terminated, either voluntarily or involuntarily, (2) it goes into liquidation, voluntarily or involuntarily, or (3) the obligation to make section 1727(d) payments is permanently terminated and the Secondary Reserve distributed before the value of its share has otherwise been fully recovered. See p. 98, *infra*. Moreover, assuming petitioner does not realize the value of its prorata share in one of the above ways, it is reasonably assured of receiving full value therefor in the form of insurance coverage in future years when its share of the Secondary Reserve is used to pay its regular section 1727(b)(1) premiums. To the extent that petitioner's share is so used, entries will undoubtedly be made in the debit column of its account which will be reflected in the balance appearing as of the end of each such year. Also, to the extent that any losses may be charged in any year against the Secondary Reserve, petitioner's prorata share thereof should similarly appear in the debit column, thereby also adversely affecting its balance as of the end of such year. And to the extent that any such debits are charged against petitioner's balance in any particular year, whether for regular section 1727(b)(1) premiums or for losses, it would seem that petitioner would be entitled to deductions in those amounts for any such year. Cf. Rev. Rul. 66–49, 1966–1 C.B. 36, 37.

As already noted, the Secondary Reserve is available for the payment of losses, but only to a very limited extent. It has, however, never been used for this purpose, nor, on the basis of the FSLIC's past loss experience, does such use appear to be likely. At the time that Congress considered Public Law 87–210, in 1961, net insurance losses of the FSLIC had absorbed only 1.1 percent of its gross income over its entire existence, H. Rept. No. 823, 87th Cong., 1st Sess., p. 2 (1961); S. Rept. No. 778, 87th Cong., 1st Sess., p. 2, and the financial statements of the FSLIC put in evidence by the parties, covering all the years thereafter through December 31, 1967, reveal no year in which the net insurance losses of the FSLIC exceeded even its investment income, much less the annual premiums for the year and/or the Primary Reserve, both of which must be fully consumed before the Secondary Reserve can be utilized. The Primary Reserve alone stood at $921,-669,395 on December 31, 1967, while the *cumulative* net losses of the

FSLIC from June 27, 1934, through December 31, 1967, totaled only $105,610,365. Of course, an event of catastrophic proportions, another Great Depression, could conceivably wipe out the Secondary Reserve, but the probability that such an event will occur is simply incalculable. It is certainly not an event that could reasonably be anticipated as of any particular time, and if any event should occur requiring a charge against the Secondary Reserve in respect of any loss, petitioner's pro-rata share thereof would then be deductible, as has already been pointed out. But there do not appear to be any greater hazards in this respect than attach to the capital investment made by a stockholder in a commercial bank or an insurance company.

Though it is clear that "prepayments" under section 1727(d) are not really insurance premiums, at least not in the year in which they are paid, a further examination of the provisions of Public Law 87–210 also reveals sharp differences between such "prepayments" and the ordinary prepaid insurance premium. While the average prepaid insurance premium gives rise to an obligation on the part of the insurer to provide coverage for some definitely ascertainable period of time, usually not more than 2 or 3 years from the date of the policy, the FSLIC incurs no such obligation upon its receipt of a section 1727(d) payment. The obligation to provide insurance coverage does not arise until the section 1727(d) payment is actually used to discharge the obligation of the insured institution to pay a regular section 1727(b)(1) insurance premium, which event is contingent upon the ratio of the FSLIC's reserves to its potential liabilities attaining certain levels. Moreover, since the section 1727(d) payment credited to the Secondary Reserve is subject to accretion through the annual "return" credited annually by the FSLIC on the outstanding balance in such reserve, and at least theoretically to depletion in the event the reserve is used to meet losses in an emergency situation, and since the regular annual premium required by section 1727(b)(1) is itself a percentage of the insured institution's accounts and creditor obligations, and thus varies from year to year, there is no way of predicting with certainty the number of years of insurance coverage which will be procured by each section 1727(d) payment, much less the precise years which will be covered. Thus, unlike the common prepaid insurance premium, the section 1727(d) payment is not simply "an exhaustible asset with a determinable life" whose value may be allocated "ratably over the term for which the premium is paid," see *George S. Jephson*, 37 B.T.A. 1117, 1120; *Higginbotham-Bailey-Logan Co.*, 8 B.T.A. 566, 577; the life of the asset created by the section 1727(d) payment is not determinable on the date of payment, and its usefulness will not be ratably spread over the period of that life.

For the period of time prior to its use to discharge the obligation of the payor institution to pay regular annual premiums required by

section 1727(b)(1), the section 1727(d) payment will simply constitute part of the capital of the FSLIC. Under the terms of the statute, section 1727(g), the prorata share of each insured institution in the Secondary Reserve will be used to pay its regular annual premiums, and the obligation of insured institutions to make section 1727(d) payments will concurrently be suspended, only after the aggregate of the FSLIC's Primary and Secondary Reserves equals or exceeds 2 percent of the total amount of all savings accounts and creditor obligations of institutions insured by the FSLIC. The obligation to make section 1727(d) payments will, however, resume, if the aggregate of the two reserves subsequently falls below 1¾ percent of the FSLIC's potential liabilities, and, until such aggregate again reaches the 2-percent level, the use of the prorata share of each insured institution to pay its regular annual premiums must also cease. It is not until the FSLIC's Primary Reserve alone equals or exceeds 2 percent of its potential liabilities that the obligation to make section 1727(d) payments will permanently terminate, at which time insured institutions are entitled to the refund of their prorata share of any amount remaining in the Secondary Reserve. Clearly then, the effect of these provisions is to require insured institutions to make and keep capital investments in the FSLIC, until it has retained enough of its own earnings (in the Primary Reserve) to provide, in the opinion of Congress, adequate protection for insured savers.

To be sure, the asset acquired by petitioner by virtue of its section 1727(d) payments, i.e., its prorata share of the FSLIC's Secondary Reserve, differs in many respects from the usual capital investment. Petitioner is required by law to make the investment, at least as long as it wishes to insure its accounts with the FSLIC, cf. *Hotel Sulgrave, Inc.*, 21 T.C. 619, the amount of the investment is determined by the growth of its business, i.e., the increase in its savings accounts, and the asset so acquired is ordinarily not transferable to others. But these differences, though perhaps not insignificant for other than tax purposes, cannot alter the fact that the section 1727(d) payment does not actually provide insurance coverage for petitioner in the year of payment, and is not an ordinary and necessary expense of that year; it results in the acquisition of an asset which, if held to "maturity" and not transferred in a merger, consolidation, or bulk sale, and not refunded in the event of a termination of insurance or liquidation, will result in benefits, in the form of insurance coverage, in future years. In these circumstances, it is a matter of no consequence whether petitioner is a cash or accrual basis taxpayer, for the rule is the same for both that: "If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such an expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made." Sec.

1.461–1(a)(1) and (2), Income Tax Regs. Moreover, we need not look far to find a similar investment which, though possessing many of these same peculiar attributes, is nevertheless a capital expenditure. An example readily at hand lies in the payment by petitioner of amounts required by section 6 of the Federal Home Loan Bank Act, 12 U.S.C. sec. 1426(c), for the acquisition of capital stock in its Federal home loan bank, a payment which we think is closely analogous to the section 1727(d) payment here, and which petitioner has consistently capitalized rather than expensed in the year of payment.

Membership in a Federal home loan bank entitles a savings and loan association to obtain advances from such bank, up to certain limits, upon the security of its home mortgages and obligations of or guaranteed by the United States, 12 U.S.C. sec. 1430(a); it thus serves the important function of providing members with a source of additional liquidity and funds for mortgage lending. As a condition of membership, the savings and loan association must initially purchase stock in one of 12 regional home loan banks, depending upon the district in which it is located, equal to 1 percent of such association's "aggregate unpaid loan principal," [4] and must purchase such additional amounts of stock thereafter as is necessary to maintain this ratio at the close of each succeeding calendar year. 12 U.S.C. sec. 1426(c)(1). Amounts so invested are not ordinarily transferable, and, in general, are returnable to the member only upon its withdrawal from membership. Also, if at the time of withdrawal the FHLB Board finds that the paid-in capital of the member's Federal home loan bank is or is likely to be impaired as a result of losses in or depreciation of the assets held by such Federal home loan bank, the amount to be paid the member in retirement of its stock is reduced by its prorata share of the amount of the impairment. 12 U.S.C. sec. 1426(i). The similarities between the mandatory payments made by petitioner to its Federal home loan bank and those made to the FSLIC are thus strikingly apparent. [5] True, petitioner did not receive any pieces of

---

[4] Defined as the aggregate unpaid principal of its home mortgage loans, home-purchase contracts, and similar obligations. 12 U.S.C. sec. 1426(c)(4).

[5] Petitioner argues that the legally compelled investments made in its Federal home loan bank are fundamentally distinguishable from the sec. 1727(d) payments here by virtue of the fact that it is entitled to dividends on its Federal home loan bank stock which are immediately available for its use, and the further fact that the Federal home loan bank may, "in its discretion," retire the stock of any member to the extent that it exceeds the required ratio. Although these are distinctions, they are nevertheless distinctions without a difference here. We do not consider it significant that petitioner's annual dividends on its Federal home loan bank stock are distributed to it rather than being credited to its account, nor do we think it important that petitioner may receive some of the funds invested in the Federal home loan bank before it begins to receive, actually or constructively, its sec. 1727(d) payments. Moreover, assuming that it remains a member of both the Federal home loan bank and the FSLIC indefinitely, petitioner will certainly receive its total investment in the FSLIC before it receives the money it has invested in its Federal home loan bank, for while there is a definite limit on petitioner's commitment to the FSLIC, there is none on its commitment of funds to the Federal home loan bank. At any rate, the question of when such investments, or the return thereon, will be redeemed is simply a question of timing; the important point is that both are in fact capital investments.

paper to evidence its prorata share of the Secondary Reserve, though one could imagine a redeemable preferred stock which incorporated all the provisions of sections 1727(d), (e), (f), and (g) as described above, which might have been issued in exchange for such payments. But it acquired an asset nevertheless, if evidenced only by the annual statements sent to petitioner every year showing the status of such prorata share. That the section 1727(d) payment made to acquire that asset was mandatory and based upon the volume of petitioner's business, and that the asset itself was nontransferable and subject to a limited extent to the losses of the corporation in which the funds were invested, does not make it any more an ordinary and necessary expense, nor less a capital expenditure, than the required investments made by petitioner in its Federal home loan bank.

Moreover, the section 1727(d) payments, which are measured by the net increase of the institution's insured accounts during the preceding year, were in fact regarded by Congress, in part at least, as being a substitute for investments in the capital stock of the Federal home loan banks which member institutions were theretofore required to make. A member institution was formerly obligated to purchase and hold such capital stock equal to 2 percent of its outstanding home mortgage loans, but when its obligation to make the section 1727(d) payments commenced in 1962, the 2-percent level in respect of the capital stock was simultaneously reduced to 1 percent. It is clear that Congress regarded these as interrelated events,[6] and in our judgment the 1727(d) payments represented capital outlays by the member institution just as much as its investment in the stock of its regional Federal home loan bank.

The legislative history of Public Law 87–210, which amended section 1727 to its present form in 1961, does not of course deal with the manner in which section 1727(d) payments should be treated for Federal tax purposes, but it is certainly not inconsistent with anything we have said here. The decade preceding the enactment of the bill witnessed a tremendous increase in the growth of institutions insured by the FSLIC, and a concomitant growth in the total amount of savings insured by the Corporation. But, in that same decade, the FSLIC was required by Congress to use its income to retire all of its capital stock, in the amount of $100 million from the U.S. Treasury. The result was a decline in the ratio of the reserves of the FSLIC to its potential liabilities during this period from 0.843 percent to 0.661 percent. See S. Rept. No. 778, 87th Cong., 1st Sess., pp. 2, 12; Hearings before House Subcommittee No. 1, Committee on Banking and Currency on H.R. 7108 and H.R. 7109, 87th Cong., 1st Sess., pp. 10, 39. Public

[6] See *infra*, p. 102.

Law 87–210 was "designed to add new strength" to the FSLIC by requiring insured institutions to make so-called "premium prepayments" which, it was hoped, "would result in a marked acceleration in building up the Corporation's reserves." H. Rept. No. 823, 87th Cong., 1st Sess., p. 2 (1961) ; S. Rept. No. 778, *supra* at 1–2.

Petitioner emphasizes that Congress spoke in terms of building up the FSLIC's *reserves*, that section 1727(d) payments are in fact credited to a "Secondary *Reserve*," and concludes that a necessary corollary is that payments made to a reserve must be insurance premiums. This is no more than semantic word play. The truth of the matter is that, for the reasons outlined at the beginning of this opinion, section 1727(d) payments cannot be considered merely additional insurance premiums. Had Congress felt that the premium income of the FSLIC was inadequate to meet expenses and losses, it could easily have increased the regular annual premium to what it considered a more realistic level, without enacting all the complicated provisions which govern section 1727(d) payments. But, in fact, during the entire life of the corporation its total expenses had, to 1961, amounted to only 3.7 percent of its gross income while net insurance losses had absorbed "a mere 1.1 percent of the gross income." Hearings, *supra* at 10. Cf. H. Rept. No. 823, *supra* at 2; S. Rept. No. 778, *supra* at 2. What was needed was additional capital, not additional premium income, which would serve as a buffer until the FSLIC had accumulated enough of its own income to bring its "Primary Reserve," the true insurance reserve, to the desired 2-percent level.[7] True, Congress called the account to which this additional capital was credited a "Secondary Reserve," but since such "reserve" served the same function as a capital account, and was available for losses "only to such extent as other accounts of the Corporation which are available therefor are insufficient for such losses," Congress' use of the terminology of the insurance industry should not confuse the issue. And what, after all, is the capital account of any corporation if not a "Secondary Reserve," a pool of capital available to creditors in the event that the corporation's current income and retained earnings are not sufficient to satisfy their claims?

---

[7] Compare the statement of Everett C. Sherbourne, vice chairman, Federal Legislation Committee, National League of Insured Savings Associations. Hearings, *supra* at 45. "From the standpoint of the loss experience of the Corporation, we do not believe the reserve would be inadequate. * * * There is, however, an inadequacy of working capital." This witness went on to explain that the FSLIC does not "sit idly by, wait for a loss to occur, and then pay out insurance," but has authority to take steps, such as the making of loans to institutions in danger of failing, which "may involve substantial cash disbursements without ultimate loss to the Corporation."

The savings and loan industry supported Public Law 87–210, see S. Rept. No. 778, 87th Cong., 1st Sess., pp. 5, 12–13, in line with its "longstanding position" that savings and loan associations should finance "their Insurance Corporation" rather than "rely on taxpayer funds for this purpose." See S. Rept. No. 378, 89th Cong., 1st Sess., pp. 71–72 (1965).

As has previously been pointed out, at the same time and in the same measure directing insured institutions to make these additional section 1727 (d) payments to the FSLIC, Congress reduced the ratio of stock which members of a Federal home loan bank were required to hold against their "unpaid loan principal" from 2 to 1 percent. It was contemplated that "For most institutions, this prepayment requirement [i.e., sec. 1727 (d) payments] would be approximately offset by reducing the stock the institution must purchase in its Federal home loan bank." See H. Rept. No. 823, *supra* at 2; S. Rept. No. 778, *supra* at 1–2. In essence, then, Public Law 87–210 provided that funds which would otherwise have gone into the capital structure of the Federal home loan banks, which already had "more than sufficient [amounts invested in capital stock] to meet the criterion of adequate capitalization," see Hearings, *supra* at 9, would be channeled instead to the FSLIC's Secondary Reserve, which is itself essentially a capital account, though more temporary in nature. Moreover, to the extent that an insured institution is required to purchase additional stock in its Federal home loan bank, its section 1727 (d) payment to the FSLIC is reduced by the amount of stock so purchased. Clearly, if the section 1727 (d) payments represented actual insurance premiums needed by the FSLIC to meet its expenses and losses, rather than merely a capital cushion for the FSLIC, this arrangement would not have been feasible.. The fungibility of capital stock payments to the Federal home loan bank and section 1727 (d) payments to the FSLIC under Public Law 87–210 strongly suggests that Congress thought of both as serving roughly the same purpose.

The conclusion then, is inescapable that section 1727 (d) payments result in the creation of an asset in the nature of a capital investment which should, however, eventually be used to provide insurance coverage in future years, and that for Federal income tax purposes at least, such payments must be capitalized and deducted from gross income only in the years and to the extent actually used to provide such insurance coverage or actually drawn upon to meet losses. Sec. 1.461–1 (a), Income Tax Regs. Nor are we convinced by petitioner's argument and the testimony of its expert witnesses that, as a matter of general accounting practice a section 1727 (d) payment should be written off immediately because of uncertainty as to whether and when it will benefit the insured institution. We have already demonstrated that, for all practical purposes, these payments will definitely be used to discharge the obligation of the insured institution to pay regular annual premiums in future years, assuming it has not previously transferred its prorata share of the Secondary Reserve or received a cash payment in respect thereof from the FSLIC. Even the years in which the Secondary Reserve will be available for such use are not

wholly a matter of conjecture, for the Office of the Comptroller of the FSLIC has made projections in this regard, showing, *inter alia*, that the aggregate of the Primary and Secondary Reserves of the FSLIC will equal or exceed 2 percent of the FSLIC's potential liabilities by 1970, and will thereafter be available for payment of regular annual premiums in subsequent years (except those in which the aggregate of the reserves falls below 1¾ percent of the FSLIC's potential liabilities, as disclosed in the projection) until 1995, when the Primary Reserve is expected to equal or exceed the 2-percent ratio by itself.[8] See Findings of Fact, p. 90, *supra*.

Moreover, the fact of the matter is that both the California savings and loan commissioner and the FHLB Board require that section 1727(d) payments be capitalized and shown on the financial statements of insured institutions as an asset, to be expensed only in the years in which actually used to satisfy the insured institution's obligation to pay a regular section 1727(b) insurance premium. It is, of course, well established that methods of accounting prescribed by regulatory agencies are not controlling for Federal tax purposes, *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552, 562; *Bellefontaine Federal Savings & Loan Association*, 33 T.C. 808, 811–812, but where, as here, the accounting treatment prescribed for a particular expenditure appears to be prompted not by any particular statutory or regulatory requirements (indeed, it would seem that agencies charged with the supervision of financial institutions would be quite anxious that the assets and net income of such institutions not be overstated) but rather to be based upon sound accounting principles, it should not be wholly disregarded. Furthermore, the financial statements of both petitioner and its parent, the First Lincoln Financial Corp. reported the section 1727(d) payments here in issue as assets, not expenses, and the firm of certified public accountants which audited such financial statements was able to state, in the accountant's report preceding such financial statements, that they presented fairly the financial position of petitioner and its parent "in conformity with generally accepted accounting principles."

We are aware that the same issue that confronts us here was raised, and recently decided in favor of the taxpayer, in *First Federal Savings & Loan Assn. of St. Joseph* v. *United States*, (W.D. Mo. 1968) 22

[8] The projections made by the FSLIC are, of course, based on a number of assumptions, and are not infallible. Still, they have been proven relatively accurate for the first 5 years since the enactment of Public Law 87–210, and, in its annual report for 1966, the FHLB Board (which administers the FSLIC) stated that it expected the aggregate of the Primary and Secondary Reserves to reach the 2-percent level by 1971, as compared to the prediction of 1970 in the original FSLIC estimate. To be sure, these estimates will not allow an insured institution to compute with pinpoint accuracy the years in which its sec. 1727(d) payments will be used to provide insurance coverage, but they do at least allow it to make a rough approximation.

104

A.F.T.R. 2d 5238, 68–2 U.S.T.C. par. 9490,⁹ the only case in which the issue herein has been adjudicated. The District Court there refused to follow Rev. Rul. 66–49, 1966–1 C.B. 36, in which it was stated that section 1727(d) payments were not deductible as ordinary and necessary expenses. The court held that section 1727(d) payments were deductible in the year of payment, relying on the fact that insured institutions are "subject to the basic liability" to make such payments, that the funds were "paid with respect to insurance coverage and * * * [were] based, to a certain extent, upon the risk of loss," and "of even more significance," upon the fact that such payments "were subject to being completely consumed in the event of a loss." We have already expressed our opinion on these matters, and, being of the view that section 1727(d) payments are nondeductible capital expenditures, we respectfully decline to follow the holding of the District Court. Though we prefer to rest our holding upon the reasons set forth in this opinion, we do agree with the conclusion reached in Rev. Rul. 66–49 that section 1727(d) payments are not ordinary and necessary expenses in the year of payment and are not deductible until they are used to pay regular premiums or losses, or the possibility of their return to the institutions is otherwise precluded. Rev. Rul. 66–49, 1966–1 C.B. 36, 37.¹⁰

Because of the unusual nature of the section 1727(d) payments in issue, the remaining cases and rulings cited by both petitioner and respondent are, for the most part, distinguishable on their facts. Thus, cases cited by petitioner for the proposition that an ordinary and necessary business expense is not rendered nondeductible because there remains after payment a contingent possibility of future recovery, e.g., *Alleghany Corporation*, 28 T.C. 298, 305; *Electric Tachometer Corporation*, 37 T.C. 158; and cf. I.T. 2764, XIII–1 C.B. 45; I.T.

⁹ That case involved a Federal savings and loan association which, unlike petitioner, a State-chartered association, was required and not merely permitted to insure its accounts with the FSLIC. Thus, it did not have the option, available to petitioner, of terminating its insured status without going into liquidation, while petitioner, theoretically at least, could cease being an insured institution of the FSLIC, receive its prorata share of the Secondary Reserve in cash, and still remain in business. We need not discuss further whether this alternative was open to petitioner as a practical matter, and do not express any opinion as to the significance of this distinction, for our disagreement with the District Court's opinion goes to the more basic issue of the inherent nature of the sec. 1727(d) payment.

¹⁰ It was also held in Rev. Rul. 66–49 that the annual return credited to each insured institution on amounts in its prorata share of the Secondary Reserve does not constitute taxable income to an insured institution on the cash basis until actually or constructively received by it, either by way of refund or by its use to discharge the insured institution's obligation to pay annual premiums. Petitioner, while of course not disparaging the Commissioner's position on this matter, claims it is inconsistent with his position on the deductibility of the sec. 1727(d) payments. The question of when this annual "return" must be included in the income of a cash basis taxpayer is not now before us, and we express no opinion thereon. We do note, however, that the position we take here, that sec. 1727(d) payments are nondeductible capital expenditures, is not inconsistent with the Commissioner's position as to the time for inclusion of the annual return in income.

3632, 1943 C.B. 114;[11] Rev. Rul. 62, 1953–1 C.B. 71, are of no help to petitioner here since it failed to establish the necessary initial foundation required by these cases; i.e., that the amount of $882,636.86 paid by it to the FSLIC in 1963 pursuant to section 1727(d) constituted an ordinary and necessary expense of that year. Cf. *Harry W. Williamson*, 37 T.C. 941, 944. Nor, on the other hand, were these payments merely security deposits in the nature of a reserve for contingent liabilities as suggested by respondent. Cf. *Spring Canyon Coal Co.* v. *Commissioner*, 43 F. 2d 78 (C.A. 10), certiorari denied 284 U.S. 654; *Wayne Title & Trust Co.* v. *Commissioner*, 195 F. 2d 401 (C.A. 3); *Wolfington Body Co.* v. *Smith*, 99 F. Supp. 788 (E.D. Pa.). Compare *Weber Paper Co.* v. *United States*, 204 F. Supp. 394 (W.D. Mo.), affirmed 320 F. 2d 199 (C.A. 8), with Rev. Rul. 60–275, 1960–2 C.B. 43. Perhaps most closely approximating the situation in this case are those cases and rulings involving payments made by Texas State banks during the 1920's to the Texas State Depositor's Guaranty Fund, which, because they shed some light on the section 1727(d) payments involved herein, we now set forth in some detail.

Texas statutes required every State bank to protect its depositors either by a bond or policy of insurance, or by becoming a contributor to the Depositor's Guaranty Fund. If the latter method was elected, the bank was required to make annual contributions to the fund based upon its average deposits, one-fourth in cash to the State treasury on which the bank was entitled to interest, though not payable until its liquidation or withdrawal from the fund, and three-fourths as a deposit on its books to the credit of the State banking board. These "regular contributions" were to continue until the fund contained $5 million. If a contributing bank failed, whatever money was needed to pay its depositors was taken from the fund, which was then immediately reimbursed by a special cash assessment levied on the contributing banks. Such "special assessments" could not exceed 2 percent of a bank's total average daily deposits in any 1 year, so that, in any year in which losses exceeded this amount, recourse was had to the fund itself, and the "regular contributions" to the fund would resume until it again reached $5 million. Each participating bank's prorata share of the fund was returnable to it upon its withdrawal from the fund or upon its liquidation.

[11] I.T. 2764, relied upon by petitioner, was declared obsolete in Rev. Rul. 68–100, 1968–1 C.B. 572. It involved payments made to a temporary insurance fund set up by the Federal Deposit Insurance Corporation in the first days of its creation, and relied upon G.C.M. 8474, IX–2 C.B. 281 which was shortly thereafter revoked by the Commissioner. G.C.M. 13290, XIII–2 C.B. 313. See text concerning the Texas State Depositor's Guaranty Fund, pp. 105–106, *infra.* I.T. 3632, another ruling cited above upon which petitioner relies, cited as its only authority I.T. 2764. Both I.T. 2764 and I.T. 3632, however, are also distinguishable on their facts, as is noted above.

The proper treatment to be accorded the regular contributions to the fund for Federal income tax purposes became a matter of some controversy. The Bureau of Internal Revenue first held that they were deductible as "necessary business expenses," I.T. 1258, I-1 C.B. 281, but soon revoked this ruling in I.T. 2208, IV-2 C.B. 81. The position was then taken that the contributions were not deductible since they "remain assets of such participating banks. Each participating bank retains at all times an interest in the fund equal to the unexpended portion of its contributions thereto, the amount whereof is readily determinable * * *." S.M. 3877, IV-2 C.B. 79. The Board of Tax Appeals did not agree with this approach, holding in *First State Bank of Bracketville*, 9 B.T.A. 975, followed in *First State Bank of Weimar*, 10 B.T.A. 396, that such contributions were deductible since they were paid "pursuant to a definite liability fixed by law." *First State Bank of Bracketville*, 9 B.T.A. 975, 980. The Bureau thereupon modified its position to conform to that of the Board of Tax Appeals. G.C.M. 8474, IX-2 C.B. 281.

However, the Board was again confronted with this issue in *Wichita State Bank & Trust Co.*, 27 B.T.A. 822. In that case, the taxpayer bank had withdrawn from the fund and had received its prorata portion thereof, and the issue raised was whether such amount was includable in its income. The Commissioner said it was, relying on his newly revised position on this matter following the *Bracketville* and *Weimar* cases, contending that since the regular contributions to the fund were deductible, their return to the taxpayer constituted taxable income. The Board, following its prior decisions, agreed. On appeal, in an opinion which we now think correctly disposed of this matter, the Fifth Circuit reversed the Board on this issue, holding that the regular contributions were not ordinary and necessary expenses but nondeductible capital expenditures. *Wichita State Bank & Trust Co.* v. *Commissioner*, 69 F. 2d 595 (C.A. 5). Keeping in mind the similar characteristics of these "regular contributions" and the section 1727(d) payments here in issue, the following comments of the Fifth Circuit are instructive (69 F. 2d at 596):

That fund [i.e., the permanent five million dollar Guaranty Fund] is not intended to be lost or consumed, but is to stand as a reservoir drawn on to provide prompt payment to depositors, but to be at once replenished by the special assessments. It is analogous to the capital of an insurance company. Each bank owns its pro rata part in it, which it ought ultimately to get back. * * * We think the contributions to the $5,000,000 Guaranty Fund, while made annually instead of in a lump sum, were essentially capital investments and ought to be dealt with as such. * * *

Here the matter of the "regular contributions" was finally settled, the Commissioner indicating agreement with the Fifth Circuit's opinion by reinstating S.M. 3877. G.C.M. 13290, XIII-2 C.B. 313.

We hold that the section 1727(d) payment of $882,636.86 made by petitioner in 1963 was a nondeductible capital expenditure, that the Commissioner correctly disallowed a deduction for this sum, and that the deficiency determined in petitioner's income tax for 1963 in respect of that disallowance was proper.

---

Petitioner has made an alternative argument that the Commissioner's attempt to assess and collect the deficiency here violated its constitutional rights under either article II, section 3 (directing the President to "take care that the laws be faithfully executed"), or the fifth amendment to the Constitution (the due process clause). Petitioner relies on the fact that in the *First Federal Savings & Loan Assn. of St. Joseph* case, discussed above, a tax refund suit in which the taxpayer savings and loan association sued to recover taxes which it alleged were erroneously paid for 1963, 1964, and 1965 due to its failure to deduct section 1727(d) payments made in those years, the Government tried to settle by offering to pay the amount sought by the taxpayer and to dismiss the action with prejudice, though it did not wish the terms of the settlement to be included in the final stipulation. It should be noted that the taxpayer refused this offer, and the District Court went to extraordinary lengths in ruling that the refund suit had not become moot. The District Court thereupon adjudicated the issue on the merits in the taxpayer's favor. Petitioner nevertheless contends that the mere fact that the offer of settlement was made to the taxpayer in the *St. Joseph* case is fatal to the determination of the deficiency herein on constitutional grounds. We think that the point is without merit.

The position taken by the Commissioner in this case in respect of section 1727(d) payments made to the FSLIC is the same as that in Rev. Rul. 66-49, published in 1966-1 C.B. 36. We have carefully examined that position, as it relates to the facts of this case, and have found the deficiency determined by the Commissioner in petitioner's income tax for 1963 was justified by the provisions of the Internal Revenue Code of 1954. We cannot and will not go further and examine the Commissioner's reasons and motives for determining the deficiency in this case and defending his position in response to the petition for a redetermination filed by petitioner in this Court. See *Charles Crowther*, 28 T.C. 1293, 1301, reversed and remanded on other grounds 269 F. 2d 292, 293 (C.A. 9). Petitioner has no ground to object merely because some other taxpayer may have been offered a windfall as a result of the Government's litigation strategy. Whatever may have been the Government's litigation strategy in attempting to dispose of the *St. Joseph* case, it is not a matter about which the petitioner herein has any standing to complain. The history of litigation over the years has been

marked by efforts of private litigants as well as the Government to select test cases in such manner as may be thought to further their respective best interests, and the refusal to press some other case has never been thought to create any rights in favor of parties to a case where similar concessions have not been made. Petitioner has been accorded due process of law in the review of the deficiency determined against it by the Commissioner herein and the fact that it has not been offered a windfall, if indeed the offer of settlement in the *St. Joseph* case was such, does not rise to the level of an infringement of its constitutional rights.

Reviewed by the Court.

*Decision will be entered for the respondent.*